**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 93-9137

RONALD KEITH ALLRIDGE,

Petitioner-Appellant,

VERSUS

WAYNE SCOTT, Director,
Texas Department of Criminal Justice,
Institutional Division,

Respondent-Appellee.

Appeal from the United States District Court
For the Northern District of Texas

(December 15, 1994)

Before GARWOOD, SMITH, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

Ronald Keith Allridge was convicted by a jury of capital murder and sentenced to death. He appeals from the district court's decision denying his petition for a writ of habeas corpus. We now affirm the district court's decision to deny the writ.

I.

On March 25, 1985, at approximately 12:30 a.m., Ronald Keith Allridge, Milton Ray Jarmon, and a third accomplice committed armed robbery at a "Whataburger" restaurant in Fort Worth, Texas. Allridge carried a shotgun while his accomplices each carried a

handgun.  During the course of the robbery, Allridge shot and killed Carla McMillen Otto.  The state of Texas indicted and, in September 1985, tried Allridge for the capital murder of Otto.

At trial, the evidence presented showed that there were three gunshots during the course of the robbery.  The sequence of events was as follows.  Immediately upon entering the restaurant, the third accomplice shot out the glass door on the east side of the restaurant with his handgun; he then remained positioned by the west door for the duration of the robbery.  Milton Jarmon went immediately to the ordering counter and leapt over it to ransack the cash registers.  In the process of leaping over the counter, Jarmon dropped his handgun, which discharged.  At the same time that Milton Jarmon was heading for the counter, Allridge confronted Otto and her two friends, all of whom were seated in a booth.  Allridge pointed his shotgun at Otto, tossed a bag at her, and said, "Fill it up bitch."  The bag fell to the ground, whereupon Allridge shot Otto.

Although Allridge confessed to killing Otto, he pled not guilty to the charge of capital murder.  In his confession to the police, Allridge claimed the shotgun fired accidentally because he was startled by another gunshot.  He did not take the stand in his defense, and his confession was only entered into evidence by the prosecution at the sentencing proceedings.  In his confession, he stated that the <u>initial</u> shot, which was fired through the glass door, was the shot which startled him.  At trial, however, counsel for Allridge claimed that Allridge was startled instead by the shot

2

fired accidentally by Milton Jarmon.  Jarmon, in fact, had given a statement to the police which corroborated Allridge's version of the sequence of shots during the robbery, wherein Jarmon said that his gun accidentally discharged as he leapt over the restaurant counter during the robbery.  Jarmon also stated that he then heard another shot fire, which both parties agree was the shot by Allridge that killed Otto.  Prior to trial, the government informed counsel for Allridge that Jarmon had given a statement to the police.  Allridge's counsel requested a copy of Jarmon's statement.  The government, citing a longstanding department policy against disclosure of co-conspirators' statements, denied the request.  Rather than attempting to procure Jarmon's statement by other means (such as asking Jarmon's lawyer or seeking a court order), counsel for Allridge elected to proceed to trial without the benefit, if any, of Jarmon's statement.[1]  He asserted that he was guilty not of capital murder (i.e., intentional killing during the commission of a robbery) but only of felony murder (i.e., unintentional killing during the commission of a robbery).

Notwithstanding the omission of Jarmon's statement, Allridge submitted other evidence to the jury that validated his version of the sequence of shots.  Melvin Adams, an employee at the time of the robbery, gave a statement to the police immediately after the murder.  In his statement, Adams stated that he heard three gunshots: the initial shot which broke the glass door, and then two

---

[1]Jarmon invoked his Fifth Amendment right at Allridge's trial and refused to testify.

3

shots in rapid succession right before the robbers left the store. At trial, however, Adams recanted and testified during direct examination by the government that he heard only two gunshots, separated by approximately one minute. Adams testified that he first heard the gunshot that shattered the glass door. He then stated that one of the robbers leapt over the counter to ransack an open cash register and that, in the process, knocked over another register.[2] The robber then returned to the other side of the counter and fled the restaurant. During cross-examination, counsel for Allridge seized on Adams' statement to the police, wherein he stated that he had heard three gunshots. Adams denied the accuracy of his statement to the police. Nevertheless, counsel for Allridge entered it into the record.

Two additional witnesses provided testimony that arguably corroborates Allridge's version of events. Sharon Burns testified for the defense that she noticed a robber leap over the counter and also that she heard "two or three" popping sounds. Teresa Barton also testified for the defense that she heard two shots separated by only seconds.

Cary Jacobs, who was dining with Otto at the time of the robbery, testified that as the robbers entered the restaurant, one of them shattered the glass door with a single gunshot. Upon entering with the others, Allridge pitched a bag to Otto and said, "Fill it up, bitch." The bag fell to the ground, whereupon

[2]Milton Jarmon was the robber who leapt over the counter. It was at this point, Jarmon said in his statement to the police, that his gun accidentally fired.

4

Allridge shot Otto. Jacobs testified that Allridge then ordered Jacobs to "pick up the bag." Jacobs complied, relinquished his wallet, and observed the robbers leaving the store. Jacobs testified that he heard neither Jarmon's gun discharge nor the cash register hit the floor.

Finally, both the defense and the state proffered their own firearms expert. Jack Benton testified for the defense that only 2.5 pounds of pressure was needed to pull the trigger on Allridge's shotgun.[3] Benton further testified that while 2.5 pounds did not qualify as a "hair trigger," it nonetheless was "extremely low." On cross-examination, Benton admitted that he attempted to make the shotgun fire accidentally but failed. Frank Shiller testified as a rebuttal witness for the state that four pounds of pressure is needed to pull the trigger of Allridge's shotgun.

After the presentation of the evidence, Allridge requested the trial court to instruct the jury on two lesser included offenses: murder and felony murder. The court denied Allridge's request and instructed the jury on capital murder and murder only. The jury returned a capital murder verdict in November 1985. In accordance with Texas' death penalty statute, TEX. CODE CRIM. PROC. ANN. art. 37.071(a) (Vernon 1981),[4] the trial court held a separate proceeding before the jury to determine whether Allridge should be sentenced to death or life imprisonment. After the presentation of

_____

[3]The shotgun was found the day after the robbery in Allridge's apartment.

[4]Texas has since amended its death penalty statute.

5

the evidence, the trial court instructed the jury to answer two "special issues:"

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result; and

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

Id. art. 37.071(b),(1)-(2). Because the jury unanimously answered both questions affirmatively, the trial court in November 1985 sentenced Allridge to death. The Texas Court of Criminal Appeals affirmed Allridge's conviction and sentence in May 1988. See Allridge v. State, 762 S.W.2d 146 (Tex. Crim. App. 1988). The United States Supreme Court finalized Allridge's conviction and sentence when it denied his writ of certiorari in February 1989. Allridge v. Texas, 489 U.S. 1040 (1989). Allridge then commenced state habeas proceedings. After his petition for state habeas corpus relief in the Texas Court of Criminal Appeals was denied, see Ex Parte Allridge, 820 S.W.2d 152 (Tex. Crim. App. 1991), Allridge filed a petition for habeas corpus in federal district court, pursuant to 28 U.S.C. § 2254 (1988). The district court denied the petition. Allridge now appeals the district court's denial of his habeas petition, presenting several issues on appeal. We affirm.

## II.

In his first claim, Allridge contends that the state failed to disclose material and exculpatory evidence to him at trial. Prior to trial, Allridge filed a motion to require the government to

disclose evidence tending to exculpate Allridge.  The state did not disclose Jarmon's confession.  Allridge now claims that the state's failure to disclose Jarmon's confession violated his Fourteenth Amendment right to due process under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  The Supreme Court has established that a prosecutor must disclose evidence to a criminal defendant if that evidence is (1) favorable to the defendant, and (2) material to the defendant's guilt or punishment.  <u>Brady</u>, 373 U.S. at 87.  We have defined "material" to mean a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.  <u>United States v. Weintraub</u>, 871 F.2d 1257, 1261 (5th Cir. 1989).

Allridge contends that he has a valid <u>Brady</u> claim with regard to the Jarmon statement.  First, he claims the statement is favorable because it buttresses his version of events.  Specifically, Allridge claims that Jarmon's statement corroborates Allridge's contention that the accidental firing of Jarmon's gun startled him, causing the "accidental" shotgun blast that killed Otto.  Second, he claims the statement is material (i.e., it probably would have affected the outcome) because it aids in establishing Allridge's state of mind.  The state was required to prove that Allridge had the specific intent to kill Otto.  The Jarmon statement, Allridge claims, could have led the jury to conclude that Allridge was, in fact, startled by Jarmon's gunshot and therefore did not have the specific intent to kill Otto.  The state responds that Jarmon's statement is neither exculpatory nor

7

material because it does not speak to Allridge's state of mind. Jarmon's statement says only that he heard a gunshot after his gun discharged. Jarmon's statement, the state notes, does not -- and cannot -- speak to Allridge's state of mind when he killed Otto.

We find Allridge's <u>Brady</u> claim unpersuasive. Allridge is in a position to assert a <u>Brady</u> claim now simply because his trial lawyer chose not to procure Jarmon's statement through other means. Allridge's trial counsel testified at the state habeas proceeding that, prior to trial, he had become aware of Jarmon's statement. He stated that he requested a copy from the government but his request was denied. Significantly, he further testified that he did not attempt to procure the statement by other means, such as perhaps asking Jarmon's lawyer or seeking a court order. Allridge, in effect, now asks us on federal habeas appeal to remedy a situation of his own making. We decline to do so because, once again, our standard of review is whether there is a reasonable probability that, had the evidence been disclosed (or, in this case, otherwise procured), the result of the proceeding would have been different. <u>United States v. Bagley</u>, 473 U.S. 667, 682-83 (1985).

We cannot say that it would be. To begin with, as the state points out, the Jarmon statement does not speak to Allridge's state of mind, which is the essence of Allridge's defense. The statement establishes only what the evidence at trial showed to be obvious: that three, and not two, shots were fired. The statement <u>does not</u> raise any issue as to whether Allridge possessed the requisite

8

intent to kill Otto. Furthermore, to the extent that any evidence of a third gunshot somehow speaks to Allridge's state of mind, the jury was provided such evidence and obviously chose not to deduce from that evidence that Allridge lacked the specific intent to kill Otto. Allridge, for example, introduced evidence of the spent shell from Jarmon's gun, thereby conclusively proving that a third shot was fired.[5] In addition, the jury was presented with Melvin Adams' statement to the police, wherein he stated that three shots were fired. While Adams later recanted, his statement nonetheless was presented to the jury. In addition, the jury heard the testimony of Sharon Burns and Teresa Barton, both of whom testified that they heard a minimum of two shots after the original shot which shattered the glass door. The Jarmon statement, in other words, would have been cumulative evidence with regard to the issue of whether a shot was fired immediately before Allridge fired the shot that killed Otto and, therefore, would not have affected the outcome of Allridge's trial. <u>Bagley</u>, 473 U.S. at 682.[6] We find that the government's failure to disclose the statement does not constitute a <u>Brady</u> violation.

---

[5]The government nonetheless chose to argue at trial that only two shots were fired. We find the government's trial strategy to be somewhat puzzling in light of the evidence.

[6]Thus, we need not determine whether Allridge's <u>Brady</u> claim alternatively fails simply because his own lack of reasonable diligence is the sole reason for not obtaining the Jarmon statement. <u>See</u> <u>United States v. Ellender</u>, 947 F.2d 748, 757 (5th Cir. 1991) ("where the defendant's own lack of reasonable diligence is the sole reason for not obtaining the pertinent material, there can be no <u>Brady</u> claim").

9

III.

Allridge next argues that the state trial court's jury instructions were constitutionally defective. At the conclusion of his trial, Allridge requested the court to instruct the jury on the lesser included offenses of murder and felony murder. The court, however, instructed the jury only on capital murder and murder.[7] Allridge now contends that the trial court's failure to include a felony murder instruction violated his Fourteenth Amendment right to due process as delineated in Beck v. Alabama, 447 U.S. 625 (1980).

In Beck, the capital defendant participated in a robbery in which the defendant's accomplice struck and killed an 80-year-old man. The defendant claimed that, while he intended to rob the victim, he did not intend to kill him. The state nonetheless tried the defendant for capital murder.[8] At the conclusion of the trial, the trial court, pursuant to state law, instructed the jury that it could "either convict[] the defendant of the capital crime, in which case it is required to impose the death penalty, or acquit[] him, thus allowing him to escape all penalties for his alleged participation in the crime." Id. at 629. In other words, even though felony murder is a lesser included offense of the capital

---

[7]The trial court refused to give a felony murder instruction because no evidence existed from which a jury could conclude that Allridge's shot was involuntary.

[8]Under Alabama law at that time, one of fourteen capital offenses included "[r]obbery or attempts thereof, when the victim is intentionally killed by the defendant." ALA. CODE § 13-11-2(a)(2) (1975).

offense of robbery/intentional killing, Alabama law forbade trial courts from issuing a lesser included offense instruction in capital cases.

The jury convicted the defendant of capital murder and, as required, sentenced him to death. On direct appeal, the Supreme Court held that the Alabama statute violated the defendant's right to due process. The Court began by noting that, under both state and federal criminal law, the standard for determining whether a lesser included offense instruction is warranted in non-capital cases is well-established: the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury to rationally find him guilty of the lesser offense and acquit him of the greater. Id. at 633-37 & n.12 (citing, among other cases, Keeble v. United States, 412 U.S. 205 (1973), and Day v. State, 532 S.W.2d 302 (Tex. Crim. App. 1975)). The purpose of the standard, the Court stated, was to ensure that the jury would accord the defendant the full benefit of the reasonable doubt standard. Id. at 634. Though Alabama argued that its "all or nothing" death penalty statute furthered that goal, the Court concluded that the statute actually risked undermining the reliability of a jury's verdict because "the unavailability of the third option . . . may encourage the jury to convict for an impermissible reason -- its belief that the defendant is guilty of some serious crime and should be punished." Id. at 642. The Court concluded that, if due process precluded such a risk in non-capital cases, then due process certainly precluded the same risk in

11

capital cases, wherein the stakes are much higher.  Thus, as we have stated before, "Beck stands for the proposition that `the jury [in a capital case] must be permitted to consider a verdict of guilt of a noncapital offense "in every case" in which "the evidence would have supported such a verdict."'"  Cordova v. Lynaugh, 838 F.2d 764, 767 (5th Cir. 1988) (quoting Hopper v. Evans, 456 U.S. 605, 610 (1982)).

Allridge contends that, even though the trial court in this case issued a third instruction, i.e., murder, the jury for practical purposes was not given that option because both capital murder and murder require the jury to find that Allridge had the specific intent to kill, which is precisely the element that Allridge challenges.  Allridge does not challenge whether he intended to commit armed robbery; he concedes that point.  Thus, Allridge argues, the choice between capital murder and murder is really a Hobson's choice because, once the jury concludes that Allridge had the specific intent to murder, the jury will be driven to choose capital murder over murder because the robbery element of capital murder is uncontested.  In other words, according to Allridge, while the instructions in this case may be different in form from the instructions in Beck, the two are functionally equivalent in that the jury was not given a third option.

Allridge's point is not without merit.  The more reasonable alternative instruction would have been, as Allridge requested, felony murder because of the elements at issue in this case. Allridge's claim, however, ultimately fails because it rests on an

12

erroneous reading of Beck and its progeny. Even if we were to assume that the evidence in this case warranted a felony murder instruction,[9] due process would not require that Allridge be given an instruction that conforms with that evidence. In Schad v. Arizona, 111 S. Ct. 2491 (1991), the defendant was charged with first-degree murder for robbing and murdering an elderly man. The defendant requested a jury instruction on theft as a lesser included offense of first-degree murder. The trial court refused and instructed the jury on first-degree murder, second-degree murder, and acquittal. The jury, after being denied a theft instruction by the court, convicted the defendant of first-degree murder, whereupon the court sentenced him to death.

On direct appeal, the defendant argued that, pursuant to Beck, he was entitled to a theft instruction. The Court rejected the defendant's generous reading of Beck. The Court began by noting that Beck addresses only those cases in which the jury is faced with an "all-or-nothing" decision. Id. at 2504-05. In such cases,

_____

[9]We note that that assumption is not easily made because the only evidence regarding Allridge's state of mind at the time of the shooting suggests, if anything, that Allridge intended to shoot Otto. Specifically, Cary Jacobs was the only witness who testified as to Allridge's demeanor at the time of the shooting. According to Jacobs, Allridge entered the restaurant and approached the booth where Otto, Jacobs, and a third person were eating. Jacobs testified that Allridge threw the bag at Otto, said, "Fill it up, bitch," and shot Otto when she failed to do so. After shooting Otto, according to Jacobs, Allridge turned the gun on Jacobs and directed Jacobs to pick the bag off the floor and fill it with his valuables. Jacobs complied because, with the shotgun aimed at his head, Jacobs feared that Allridge would shoot him as well. Once Jacobs had relinquished his valuables, Allridge left the restaurant. Jacobs' testimony regarding Allridge's demeanor does not describe someone who has just "accidentally" shot another person.

13

the Court reasoned, a jury's capital murder verdict is presumptively unreliable because "`[t]he absence of a lesser included offense instruction increases the risk that the jury will convict . . . simply to avoid setting the defendant free.'" Id. at 2505 (quoting Spaziano v. Florida, 468 U.S. 447, 455 (1984)). But if the jury is given a third instruction, particularly one that is supported by the evidence, then due process is no longer implicated.

The defendant in Schad countered that, while a third instruction may satisfy due process, any third instruction will not suffice because, if the jury agrees with the defendant's theory of the case, it will be unable to register its view. The Court disagreed, pointing out that the key consideration in a Beck claim is not the form of the jury's instructions but the reliability of a jury's capital murder verdict. The Court further reasoned:

> To accept the contention advanced by petitioner and the dissent, we would have to assume that a jury unconvinced that petitioner was guilty of either capital or second-degree murder, but loath to acquit him completely (because it was convinced he was guilty of robbery), might choose capital murder rather than second-degree murder as its means of keeping him off the streets. Because we can see no basis to assume such irrationality, we are satisfied that the second-degree murder instruction in this case sufficed to ensure the verdict's reliability.

Schad, 111 S. Ct. at 2505; see also Montoya v. Collins, 955 F.2d 279, 285-86 (5th Cir. 1992) (a lesser included offense instruction satisfies due process, even though the instruction did not conform with the defendant's theory of the case).

We find that Schad controls our disposition of this issue. While the trial court's third instruction did not conform to

14

Allridge's defense strategy, sufficient evidence existed from which the jury could reasonably have concluded that Allridge was guilty of murder. We recognize that had the jury returned a verdict of murder only, such a verdict would effectively acquit Allridge of robbery, a charge which he does not challenge. As illogical as this hypothetical verdict may be, it does not render the trial court's jury instructions unconstitutional because, in the final analysis, sufficient evidence existed for the jury to convict Allridge of murder. Our reading of Beck and Schad instructs us that the trial court was not constitutionally bound to provide a wider menu of jury instructions. Instead, because the jury had the viable option to choose murder over capital murder, we are satisfied that that option ensured the reliability of the jury's capital murder verdict.

IV.

Under Texas law, a defendant may not be sentenced to death without a prior determination by the sentencing jury that, inter alia, the defendant represents a future danger to society. TEX. CODE CRIM. PROC. ANN. art. 37.071(b)(2). At the sentencing hearing, Allridge proffered expert testimony outside the presence of the jury that indicated Allridge almost certainly would be ineligible for parole and, therefore, did not pose a future danger. The trial court, however, refused to permit Allridge to introduce the evidence. Allridge now contends that the trial court's evidentiary ruling, and the court's subsequent refusal to instruct the sentencing jury that Allridge almost certainly would serve the

15

remainder of his life in prison, violated his Fourteenth Amendment right to due process.

In particular, Allridge maintains that the trial court denied his due process right to rebut the state's case against him as a future danger.  Allridge principally relies on Gardner v. Florida, 430 U.S. 349 (1977), wherein the Supreme Court vacated a death sentence because the trial court relied in part on confidential portions of a presentence investigation report that were not available to the parties.  The Court reasoned that the defendant's right to due process was violated "when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain."  Id. at 362 (plurality opinion).  Allridge maintains his opportunity to deny or explain his future dangerousness was similarly denied when the trial court refused to allow him to introduce evidence of his parole ineligibility.  The Court, according to Allridge, has traditionally regarded evidence of parole ineligibility as constitutionally relevant.  In California v. Ramos, 463 U.S. 992 (1983), for example, the Court ruled that a state statute requiring trial courts to instruct capital juries that a sentence of life imprisonment without the possibility of parole could be commuted by the governor was not unconstitutional. Allridge essentially argues that, when considered together, Gardner and Ramos stand for the following proposition: when the state argues that a capital defendant represents a future danger to society and therefore should be sentenced to death, then that defendant is

16

constitutionally entitled to introduce evidence regarding his parole ineligibility.

Allridge insists that this proposition was recently endorsed by the Supreme Court in Simmons v. South Carolina, 114 S. Ct. 2187 (1994). In Simmons, the defendant was charged with murdering an elderly woman. Immediately prior to trial, the defendant pled guilty to two separate assaults on elderly woman. Thus, once the defendant was convicted in Simmons of his third and most recent criminal offense, he was rendered ineligible for parole under the state's "two-strikes-and-you're-out" statute.[10] At sentencing, the state argued that the defendant represented a future danger to society and, therefore, should receive the death sentence. The defendant, in response, proffered evidence outside the presence of the jury that demonstrated that, as a matter of state law, he was ineligible for parole. The trial court rejected the defendant's proffer, noting that South Carolina juries may not consider the issue of parole when sentencing a defendant convicted of capital murder. The jury later sentenced the defendant to death.

On direct appeal, the Supreme Court reversed the defendant's sentence. The Court began its analysis in Simmons by revisiting a variety of its due process cases, wherein the Court established that the due process clause entitles a criminal defendant to a

---

[10]See S.C. CODE ANN. § 24-21-640 (Supp. 1993). The statute provides:

> The board must not grant parole nor is parole authorized to any prisoner serving a sentence for a second or subsequent conviction, following a separate sentencing from a prior conviction, for violent crimes as defined in Section 16-1-60.

17

complete defense.  Id. at 2193-95.  According to the Court, the trial court's refusal to admit the defendant's evidence regarding parole ineligibility ran afoul of those cases because the state "raised the specter" of future dangerousness without affording the defendant the chance to demonstrate that "he was legally ineligible for parole and thus would remain in prison if afforded a life sentence."  Id. at 2194-95.  The Court recognized that, as a general rule, the decision about whether to inform a jury about parole eligibility is left to the states.  Id. at 2196 (citing Ramos, 463 U.S. at 1014).  But the Court qualified that rule when future dangerousness is at issue.  Specifically, "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible."  Id. at 2190.

Allridge reads Simmons to mean that he was constitutionally entitled to introduce evidence of his parole ineligibility.  He recognizes that Texas, unlike South Carolina, did not statutorily provide for parole ineligibility at the time of his conviction. But he characterizes that distinction as irrelevant because, regardless of whether a capital defendant is ineligible for parole as a matter of law or a matter of fact, the defendant should not be denied the opportunity to rebut the state's case for future dangerousness with evidence of parole ineligibility.

We disagree.  As the Court made clear in Simmons, the "logic and effectiveness of petitioner's argument naturally depended on

18

the fact that <u>he was legally ineligible for parole</u>." <u>Id</u>. at 2194-95 (emphasis added). A capital defendant's parole ineligibility, in other words, must be a matter of law because evidence of such ineligibility is inherently "truthful" and allows the defendant to deny or explain the state's case for future dangerousness. <u>Id</u>. at 2196. But if a defendant's ineligibility is a matter of fact, i.e., the defendant <u>probably</u> will not be eligible for parole, then the evidence is purely speculative (maybe even inherently "untruthful") and therefore cannot positively deny future dangerousness. The jury is left only to speculate about what a parole board may, or may not, do twenty or thirty years hence. Relying on <u>Ramos</u>, the Court in <u>Simmons</u> reaffirmed that states can properly choose to prevent a jury from engaging in such speculation as a means of providing greater protections in their criminal justice systems than constitutionally required. <u>Id</u>. (citing <u>Ramos</u>, 463 U.S. at 1014). Texas accordingly has chosen to keep from juries evidence or instructions of parole eligibility, <u>see Rose v. State</u>, 752 S.W.2d 529, 534-35 (Tex. Crim. App. 1987), and on two separate occasions, we have chosen not to meddle with the state's chosen policy. <u>See King v. Lynaugh</u>, 850 F.2d 1055, 1060-61 (5th Cir. 1988) (en banc); <u>O'Bryan v. Estelle</u>, 714 F.2d 365, 388-389 (5th Cir. 1983). But Texas, unlike South Carolina, did not statutorily provide for parole ineligibility at the time of Allridge's conviction.

Thus, Simmons is inapplicable to this case.[11]  The Court, in fact, suggested as much when it pointed out that, while Texas and South Carolina refuse to inform juries about parole eligibility, Texas does not provide "a life-without-parole sentencing alternative to capital punishment."  Simmons, 114 S. Ct. at 2196 n.8.  We therefore read Simmons to mean that due process requires the state to inform a sentencing jury about a defendant's parole ineligibility when, and only when, (1) the state argues that a defendant represents a future danger to society,[12] and (2) the defendant is legally ineligible for parole.  Because Texas did not statutorily provide for parole ineligibility at the time of

---

[11]In addition to failing on the merits, Allridge's Simmons claim would be barred under the non-retroactivity limitation the Supreme Court announced in Teague v. Lane, 489 U.S. 288, 301 (1989).  Specifically, if we were to conclude, as Allridge urges us to do, that due process entitles a capital defendant to introduce evidence of parole ineligibility whenever the state argues the defendant is a future danger, regardless of whether the state statutorily provides for parole ineligibility, such a conclusion certainly would constitute a "new rule" and therefore would be barred under Teague.

[12]We note that Simmons particularly applies to those cases in which the state argues that the defendant is a future danger to free society.  But when the state argues that the defendant poses a future danger to everybody, fellow inmates included, then Simmons is inapplicable because whether the defendant is eligible for parole is irrelevant.  Simmons, 114 S. Ct. at 2194 n.5.  For example, given his proclivity for assaulting only elderly women, the defendant in Simmons argued that he did not pose a future danger to anyone in prison.  Id. at 2191.  In this case, however, the state pointed out that Allridge had committed acts of violence against other prisoners during a previous incarceration and, therefore, posed a future danger wherever he may be.

Allridge's conviction, we find Allridge's reliance on <u>Simmons</u> to be unavailing.[13]

V.

Finally, Allridge argues that, in three separate ways, the second special issue submitted to the sentencing jury prevented the jury from giving effect to certain mitigating evidence. Therefore, Allridge argues, the jury's ultimate death sentence violated Allridge's Eight Amendment right against cruel and unusual punishment as defined in <u>Penry v. Lynaugh</u>, 492 U.S. 302 (1989). Allridge first contends that his alleged parole ineligibility constitutes mitigating evidence and that, because the trial court refused to allow him to introduce this evidence, the second special issue prevented the jury from giving the evidence proper mitigating effect. In the preceding section, we concluded that, as a matter of due process, Allridge was not constitutionally entitled to submit evidence or an instruction regarding the likelihood, or not, of his being paroled. The fact that Allridge now presents it as a <u>Penry</u> cruel and unusual punishment claim, rather than as a <u>Simmons</u>

---

[13]In connection with his <u>Simmons</u> claim, Allridge attacked the wording of the second special issue of Texas' death penalty statute as unconstitutionally vague. The issue asks "whether there is a probability that the defendant would constitute a continuing threat to society?" TEX. CODE CRIM. PROC. ANN. art. 37.071(b)(2). Allridge maintains that the use of the word "would" is not premised on any specific condition, such as: would he pose a future danger if imprisoned for life? Allridge's vagueness claim is essentially another way of making the same point, i.e., that the state constitutionally deprived him of informing the jury of his parole ineligibility. For reasons already provided in our discussion of <u>Simmons</u> and <u>Ramos</u>, we find Allridge's vagueness claim unavailing.

21

due process claim, does not require us to reach a different conclusion. We reject Allridge's first <u>Penry</u> claim.

Allridge's next <u>Penry</u> claim is much more typical of the numerous <u>Penry</u> claims we have considered in the last five years. At sentencing, Allridge's father -- a non-expert as to medical diagnoses -- testified that Allridge allegedly suffered mental illness and abuse during a previous incarceration. At sentencing, Allridge requested an instruction permitting the jury to give mitigating effect to his father's testimony. The trial court refused, and Allridge now claims that the trial court's refusal deprived him of his right under <u>Penry</u> to an instruction beyond the two statutory special issues. We disagree. We have stated that, while <u>Penry</u> appears to be worded broadly, the case has been interpreted narrowly. <u>Andrews v. Collins</u>, 21 F.3d 612, 629 (5th Cir. 1994). We, for example, have construed <u>Penry</u> to mean that the capital defendant must be able to demonstrate that his crime is attributable to a uniquely severe disability. <u>Madden v. Collins</u>, 18 F.3d 304, 306-09 (5th Cir. 1994); <u>Barnard v. Collins</u>, 958 F.2d 634, 636-38 (5th Cir. 1992). Allridge, to say the least, has failed to show any such linkage based solely on the non-expert, hearsay testimony of his father. His second <u>Penry</u> claim therefore fails.

In his last <u>Penry</u> claim, Allridge argues that the second special issue creates a disincentive for introducing medical evidence of mental disabilities because, if introduced, the evidence may encourage, rather than discourage, the jury to

22

affirmatively conclude that Allridge represents a future danger to society. As we have stated before, capital defendants cannot base a <u>Penry</u> claim on evidence that could have been, but was not, proffered at trial. <u>Crank v. Collins</u>, 19 F.3d 172, 175-76 (5th Cir. 1994); <u>Barnard v. Collins</u>, 958 F.2d 634, 637 (5th Cir. 1992); <u>May v. Collins</u>, 904 F.2d 228, 232 (5th Cir. 1990). As the Supreme Court has stated, "[n]othing in the Constitution obligates state courts to give mitigating circumstance instructions when no evidence is offered to support them." <u>Delo v. Lashley</u>, 113 S. Ct. 1222, 1225 (1993). We therefore reject Allridge's last <u>Penry</u> claim.

## VI.

For the foregoing reasons, we AFFIRM the decision of the district court to deny the writ.