**Opinion issued June 28, 2012.**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-11-00442-CR

## NO. 01-11-00443-CR

—————————————

**DEMETRIE TREVAIL DIXON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 185th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 1265635 and 1265636**

## MEMORANDUM OPINION

A jury convicted Demetrie Trevail Dixon of two counts of sexual assault and

assessed punishment at six years' confinement for each count, with the sentences

to run concurrently.[1] In three issues on appeal, Dixon contends that the trial court erred during the guilt phase of trial by (1) admitting scientific testimony that was not reliable or proffered by a qualified expert, (2) admitting "victim character" evidence, and (3) denying his motion for new trial based on the State's violation of his due process rights in failing to disclose favorable evidence.

## Background

The north-central area of Houston is the Houston Police Department's largest patrol area and is "known to have a high concentration of prostitution activity[.]" Dixon worked as a patrol officer during the night shift in the north-central area; specifically, he patrolled an area that included Antoine Street, West 34th Street, Mangum Street, and Dacoma Street in a marked patrol car between the hours of 11:00 p.m. and 7:00 a.m. As a patrol officer, Dixon's ordinary job responsibilities included answering service calls and maintaining a visible police presence. His ordinary job responsibilities did not include investigation of prostitution or participation in other vice activities.

Captain V. Rodriguez, a twenty-six-year veteran of the HPD, commands patrol of the north-central area. In the spring of 2010, another officer complained to Rodriguez about ongoing police misconduct towards women in the north central area. Rodriguez conducted a preliminary investigation and identified Dixon as a

---

[1] *See* TEX. PENAL CODE ANN. § 22.011 (West 2011).

suspect. Rodriguez referred the matter to HPD's internal affairs division, and that division—led by Sergeant D.M. Chambers—began an investigation. By canvasing Dixon's patrol area for information, Chambers learned of a potential sexual assault victim—a prostitute who went by the name of "Fifi." Chambers eventually located "Fifi" in a county jail facility. When he asked her if she knew of any police misconduct, she started to cry. "Fifi," hereinafter the "complainant," told the officers that she had been sexually assaulted by an on-duty patrol officer twice— once on March 15, 2010 and again on April 25, 2010. She stated that the sexual assaults took place in the early morning hours near industrial warehouses in the north-central area. In a photo array, she identified Dixon as her assailant.

Chambers verified that Dixon was on duty on March 15th and April 25th. Like all other HPD patrol cars, Dixon's patrol car included mobile data terminal (MDT) and automatic vehicle locator (AVL) technology. The MDT is a computer by which officers make reports, acquire information, and communicate. The AVL is "basically a GPS device that tracks the [patrol] vehicles." Chambers requested the data generated by both systems for Dixon's patrol car. He also conducted undercover surveillance of Dixon on patrol. During that surveillance, the internal affairs team observed Dixon park his patrol car, turn off the patrol car lights, and get out of the patrol car in a dark industrial warehouse area like the one described

3

by the complainant. Finding Dixon's behavior suspicious, Chambers and the internal affairs division intervened and brought Dixon in for questioning.

A grand jury indicted Dixon on two counts of sexual assault—one count for the March 15th incident and one count for the April 25th incident—and the case proceeded to trial. During the guilt phase of the trial, the complainant described her history of drug addiction and prostitution. She testified that she withdrew from high school and began smoking marijuana and drinking at a young age. When her parents divorced, she stayed with her father. From him, she learned to smoke crack cocaine at the age of fourteen or fifteen, and she sometimes purchased the drugs they smoked together. Her father's friends introduced her to the "dope dealers." On one drug run, her father's friends abandoned her in the area where they bought drugs. Having no way to contact her father or to get home, the complainant stayed in that area by herself for four to five months. She slept in various homes and motel rooms, and she used crack cocaine daily. The complainant began working as a prostitute at the age of fifteen to finance her drug habit.

The complainant also testified about the events giving rise to the charges against Dixon. Around the time of the sexual assaults, she worked as a prostitute in the north-central area of town. She used drugs four to five times per day. She always took her customers to hotels as a safety precaution; she never agreed to perform sexual acts in her customers' cars. The locations from which she solicited

4

customers included a Texaco gas station on 34th Street and Antoine Street. The complainant admitted that she engaged in illegal activity by abusing drugs and performing sexual acts for a fee and that she had been arrested on multiple occasions—although never by Dixon. She described her relationship with the patrol officers in the area as friendly, and due to her numerous encounters with police, she was familiar with arrest procedures.

On March 15th—the date of the first sexual assault—the complainant was staying at a friend's apartment off 34th Street. Around 5:00 a.m., she left the apartment with another friend. They stopped at a Jack-in-the-Box for breakfast, and were some of the restaurant's first customers when it opened at 6:00 a.m. The complainant's plan for the remainder of the day was to "eat, clean up, take [the friend with whom she stayed] something to eat, get high and go to work." When she left the Jack-in-the-Box, she began walking down 34th Street toward the apartment. A uniformed police officer in a marked patrol car stopped her near the Circle P convenience store located between the Jack-in-the-Box and the apartment. At the time, she did not have any crack cocaine on her person, and she was not soliciting customers or engaged in other illegal activity. The officer asked if she had ever been arrested and instructed her to tell her friend to go home. The officer then exited the patrol car, grabbed her by the arm, and told her to get into the car.

5

When he did not "pat her down" before putting her in the patrol car, she "knew something wasn't right."

The officer drove behind the Circle P store and parked the patrol car between the warehouses located nearby. It was still dark outside. The officer asked for and ran the complainant's name on his computer. He turned the patrol car lights off, got out of the patrol car, and approached the back door. He instructed the complainant to get out the car so that he could search her. When she requested that a female officer perform the search, the officer instructed her to take all of her clothing off. She complied. He then sexually assaulted her.

With respect to the sexual assault on April 25th, the complainant testified that she was working from a bus stop outside the Texaco gas station on 34th Street and Antoine Street when a uniformed police officer parked his patrol car in the parking lot behind the bus stop. She immediately recognized the officer as the man who assaulted her on March 15th. Because it was in the early morning hours, it was dark outside and there was no traffic. The officer asked the complainant if she was "ready to get this over with or go to jail[.]" Because he was in uniform, the complainant did not feel free to ignore him or run. The officer again grabbed her arm and placed her in the back of the patrol car. He did not notify dispatch that he had a female passenger in the car or ask for a female officer to join him at the scene. Again, the officer drove her to an industrial warehouse area; this time, he

6

parked his patrol car in front of an abandoned school bus. The officer removed the complainant from the patrol car and sexually assaulted her for the second time. The officer then drove the complainant back to the Texaco station.

The complainant identified Dixon as her assailant in court. The complainant denied that she had consented to any of the sex acts forced upon her by Dixon. She informed the jury that she had not received anything from the prosecution in exchange for her testimony.

To corroborate the complainant's story, the State presented the testimony of several law enforcement officials. The jury heard testimony from both Rodriguez and Chambers regarding ordinary police procedures. They informed the jury that patrol officers should not detain a person without probable cause or transport a person to a different location before performing a weapons search or running a name check for outstanding warrants. A male officer should not perform a pat-down or contraband search of a female suspect, and strip searches are never performed in public. Special procedures apply when a male officer transports a female passenger—the officer should inform dispatch that he has a female passenger, that he is leaving a specific location, and that he is traveling to a specific location. Dispatch then tracks the time at which the officer departs and arrives with the female passenger. According to the complainant's testimony, Dixon did not follow any of these procedures.

The State also presented the testimony of G. Jordan, a chief fraud examiner with the Harris County District Attorney's public integrity division. Jordan analyzed the MDT records from Dixon's patrol vehicle by searching for entries using the complainant's name. His search revealed that, at 6:07 a.m. on March 15th, Dixon conducted a "person check" from his patrol car using the complainant's name.

Sergeant R. Cruz, another internal affairs officer, also testified regarding the investigation of Dixon's crimes. Over Dixon's objection, Cruz testified that he collected and reviewed the AVL data from Dixon's patrol car to determine Dixon's location on the dates and times of the sexual assaults. Specifically, Cruz converted the physical addresses provided by the complainant into latitude and longitude coordinates. Searching within a 200-foot radius of the coordinates, he generated a list of the patrol cars that traveled through the areas around the time the sexual assaults occurred. Because this list included Dixon, Cruz retrieved the AVL data specific to Dixon's patrol car. The AVL data provided dates, times, unit information, longitude and latitude coordinates, directional information, and velocity. Cruz plotted the data for March 15th, between the hours of 5:58:26 a.m. to 6:30:45 a.m., and April 25th, between the hours of 1:46:17 a.m. to 2:16:15 a.m, on a map. Using the map, he gave testimony regarding the routes traveled by Dixon on the dates of the sexual assaults. He concluded that, consistent with the

8

complainant's story, Dixon parked his patrol vehicle in an industrial warehouse area near the Circle P on 34th Street for twenty-eight minutes on the morning of March 15th and near an abandoned school bus for twelve minutes on the morning of April 25th.

Cruz further stated, without objection, that he personally visited the two locations where the complainant alleged the sexual assaults occurred. He found the condition of the areas to be consistent with the complainant's description. He described the industrial warehouse area behind the Circle P as being dimly-lit and not visible to passing traffic. Regarding the industrial warehouse area near the abandoned school bus, Cruz testified that a vehicle parked in front of the school bus would not be visible to passing traffic.

After considering the evidence presented by the State and the arguments of counsel, the jury found Dixon guilty on both counts of sexual assault and assessed his punishment at six years' confinement. This appeal followed.

**Admission of Evidence**

I. **Scientific Evidence**

In his first issue, Dixon contends that the trial court erroneously admitted scientific evidence, specifically the AVL data showing the location of Dixon's patrol vehicle on the date and time the complainant was sexually assaulted. Dixon argues, first, that the AVL data was unreliable in assisting the jury to determine a

9

fact in issue—namely, whether Dixon was at the place where the complainant was sexually assaulted for a length of time sufficient to commit the offense—and second, that Cruz was not qualified to give the testimony.

Whether to admit scientific evidence is a decision within the trial court's discretion. *See Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009); *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). Such decisions will rarely be disturbed by an appellate court. *Vela v. State*, 209 S.W.3d 128, 136 (Tex. Crim. App. 2006); *Rodgers v. State*, 205 S.W.3d 525, 527−28 n.9 (Tex. Crim. App. 2006). As with other types of evidentiary rulings, we will uphold the trial court's decision unless it lies outside the zone of reasonable disagreement. *Layton*, 280 S.W.3d at 240. If the record supports the trial court's decision on the admission of evidence, there is no abuse of discretion. *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002).

### A.    Reliability

To preserve an argument that the AVL data was unreliable, the record must show that the party made a specific objection on the record and received an adverse ruling on that objection. *See* TEX. R. APP. P. 33.1(a); *Turner v. State*, 805 S.W.2d 423, 431 (Tex. Crim. App. 1991). To make a specific objection, a party must "let the trial judge know what he wants, why he thinks himself entitled to it, and . . . do so clearly enough for the judge to understand him at a time when the

10

trial court is in a proper position to do something about it." *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992). Notwithstanding a party's failure to make a specific objection, error will be preserved if a specific objection was apparent from the context. *See* TEX. R. APP. P. 33.1(a)(1)(A); *see also* TEX. R. EVID. 103(a)(1).

A party may challenge expert testimony on at least three specific grounds: (1) the witness does not qualify as an expert because the witness lacks the requisite knowledge, skills, experience, training, or education in the subject matter of the testimony; (2) the subject matter of the testimony is inappropriate because it is unreliable; or (3) the testimony will not assist the factfinder in deciding the case. *See Vela*, 209 S.W.3d at 131, 133−34; *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992); *see also* TEX. R. EVID. 401, 702, 705(c). Respectively, these criteria are commonly referred to as "qualification," "reliability," and "relevance." *Vela*, 209 S.W.3d at 131. They raise distinct inquiries, and an objection based on one of the criteria does not preserve error as to another. *See id.* (stating that qualifications of expert witness are "distinct from reliability and relevance and, therefore, should be evaluated independently"); *Turner v. State*, 252 S.W.3d 571, 584 n.5 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (holding that objection based on expert's qualifications did not preserve reliability issue).

11

Here, in anticipation of Cruz's testimony about the AVL data, Dixon requested leave to voir dire Cruz on the ground that he lacked "the background necessary to qualify him as an expert on that scientific testimony[.]" During voir dire, Dixon inquired primarily about Cruz's qualifications—asking whether Cruz had a "college degree in anything scientific" or had attended classes regarding the collection or analysis of AVL data; whether he understood the "computer or the algorithms or any of the mathematic bases" for the AVL data or had spoken with the AVL programmers about how that data is collected; and whether he understood the rate of error in the data collected. Although Dixon asked whether Cruz had "any idea about the scientific reliability in terms of reviewing studies for how accurate [the AVL system's] latitude and longitude findings are," that question sought information about whether Cruz had the requisite knowledge to give an opinion on the AVL data rather than the reliability of the data itself. At the end of voir dire, Dixon made this objection:

> [W]e would lodge a 702 objection that this witness is not qualified to offer and have admitted the evidence of the AVL because he has no understanding and reliance of accuracy. The 702 predicate, while not exhaustive, is clearly clear that there ha[s] to be some sort of foundation for his reliance on the evidence that he's putting forth before the jury.[2]

---

[2]     Rule of Evidence 702 provides:

>     If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

12

He then referred the trial court to a number of cases addressing the qualification of expert witnesses before reasserting his position that Cruz was "not an expert."[3]

Nowhere in the record do we find an objection that Cruz's testimony on the AVL data should be excluded because the data he sought to introduce was unreliable. Dixon renewed his voir dire objection when Cruz testified before the jury, and the context provided by the voir dire does not suggest that Dixon objected to reliability of the data as well as to Cruz's qualifications to offer an opinion interpreting the AVL data. Absent such an objection, any question about the reliability of the AVL data is not preserved for our review. *See* TEX. R. APP. P. 33.1; *Turner*, 252 S.W.3d at 584 n.5.

---

experience, training, or education may testify thereto in the form of an opinion or otherwise.

TEX. R. EVID. 702.

[3] Specifically, Dixon sought to highlight Cruz's lack of qualification by comparing his knowledge and experience to a civil engineer who explained how a GPS-based system worked in *McLaughlin, Inc. v. Northstar Drilling Technologies, Inc.*, 138 S.W.3d 24 (Tex. App—San Antonio 2004, no pet.); a police officer who had a college in degree in geography and could explain GPS technology in *Brown v. State*, 163 S.W.3d 818 (Tex. App.—Dallas 2005, pet. ref'd); a police officer having more than sixty hours of training who testified about blood-spatter and blood-stain evidence in *Wilson v. State*, 195 S.W.3d 193 (Tex. App.—San Antonio 2006, no pet.); and a police officer holding a certification in horizontal gaze nystagmus testing in *Emerson v. State*, 880 S.W.2d 759 (Tex. Crim. App. 1994). Dixon did not make any assertion in the trial court that these cases were persuasive on the issue of the reliability of the AVL data.

### B.    Qualifications

Dixon next contends that Cruz lacked the knowledge, education, and training to qualify him as an expert on the interpretation of AVL data. Dixon points out that, according to Cruz's own testimony, he had only two hours of formal training on the AVL system; he did not have a college degree in any scientific field; he did not understand the science underlying the AVL system or know the system's rate of error; and other than the system manual, he had not read any literature on the subject. The State responds that Cruz "was a fact witness, not an expert witness. His testimony was not based on any technical or specialized knowledge of the inner-workings of the [AVL] system"; instead, he testified "based on his role in the investigation . . . and as the custodian of the AVL records." For our analysis here, we assume expert testimony was required to assist the jury in understanding the AVL data.

"Qualification is a two-step inquiry. A witness must first have a sufficient background in a particular field, and a trial judge must then determine whether that background goes to the matter on which the witness is to give an opinion." *Davis v. State*, 329 S.W.3d 798, 813 (Tex. Crim. App. 2010). There is no rigid formula for determining whether an expert is qualified to testify. "Because the spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses appropriate qualifications as an expert on

14

a specific topic in a particular case." *Id.* The focus is on the "fit" between the subject matter of the testimony and the expert's familiarity with that subject matter. *Vela*, 209 S.W.3d at 133.

To give appellate courts some guidance in determining whether a trial court abused its discretion in ruling on an expert's qualifications, the Court of Criminal Appeals has set forth three criteria: (1) "[I]s the field of expertise complex?"; (2) "[H]ow conclusive is the expert's opinion?"; and (3) "[H]ow central is the area of expertise to the resolution of the lawsuit?" *Rodgers v. State*, 205 S.W.3d 525, 528 (Tex. Crim. App. 2006). The Court explained these criteria:

> First, is the field of expertise complex? The degree of education, training, or experience that a witness should have before he can qualify as an expert is directly related to the complexity of the field about which he proposes to testify. If the expert evidence is close to the jury's common understanding, the witness's qualifications are less important than when the evidence is well outside the jury's own experience. For example, DNA profiling is scientifically complex; latent-print comparison (whether of fingerprints, tires, or shoes) is not. Second, how conclusive is the expert's opinion? The more conclusive the expert's opinion, the more important is his degree of expertise. Testimony that "a given profile occurred one time in 2.578 sextillion (2.578 followed by 21 zeroes), a number larger than the number of known stars in the universe (estimated at one sextillion)" requires a much higher degree of scientific expertise than testimony "that the defendant's tennis shoe could have made the bloody shoe print found on a piece of paper in the victim's apartment." And third, how central is the area of expertise to the resolution of the lawsuit? The more dispositive it is of the disputed issues, the more important the expert's qualifications are. If DNA is the only thing tying the defendant to the crime, the reliability of the expertise and the witness's qualifications to give his opinion are more crucial than if eyewitnesses and a confession also connect the defendant to the crime.

15

*Id.*; *see Davis*, 313 S.W.3d at 350.

Following *Rodgers*, we first consider the complexity of the field of expertise serving as the basis for Cruz's testimony. Cruz explained that the AVL system is GPS-based. Through satellite transmission, devices installed in patrol cars send latitude and longitude coordinates to a computer maintained by HPD. The AVL data interpreted by Cruz consisted of computer-generated spreadsheets, listing the date and time, the patrol car "unit information," its latitude and longitude coordinates, its "GPS azimuth" (meaning direction), and its velocity. Although the science underlying the compilation of this data is technically complex, the process by which Cruz interpreted the data was not. As part of the internal affairs investigation, Cruz converted the physical addresses provided by the complainant into latitude and longitude coordinates. Using the dates and times of the complainant's sexual assault, Cruz retrieved the AVL data within a 200 foot radius of those coordinates in order to "pick up" the patrol cars that traveled through the area. Because the search "picked up" Dixon, Cruz then retrieved the AVL data specific to Dixon's patrol car and plotted its longitude and latitude coordinates on the dates and times of the sexual assaults on a map. Cruz also informed the jury of the periods of time during which the AVL system reported Dixon's patrol car as having a zero velocity, and he opined that, during those periods, Dixon's patrol car was parked. Cruz's analysis was thus straightforward, relatively simple, and likely

16

not far from the jurors' common understanding of GPS-based technology. Consequently, the required degree of education, training, and experience was not high. *See Rodgers*, 205 S.W.3d at 528.

Dixon did not challenge the business records that recorded Dixon's AVL data. A person may lack expertise in how a piece of equipment operates but be qualified to interpret the data the equipment collects (i.e., like a cardiologist who interprets an EKG). Cruz's qualifications—more than sixteen years' experience as a police officer, a two-hour course on the use of the AVL system, a full reading of the system manual, and his daily performance and use of AVL data analysis as a member of HPD's internal affairs division conducting surveillance of police officers—sufficed to render his testimony helpful to the jury in understanding the evidence. *See* TEX. R. EVID. 702; *see also Kelly*, 824 S.W.2d at 572.

With respect to *Rodgers*'s second and third prongs, we conclude that Cruz's testimony was neither conclusive nor dispositive. Cruz's testimony established that Dixon's patrol vehicle was in the locations described by the complainant on the dates and at the times she said the sexual assaults occurred. While this evidence connects Dixon to the complainant, it does not, by itself, conclusively connect Dixon to the sexual assaults. Cruz did not mislead the jury that his analysis was beyond a risk of error. On cross-examination, he acknowledged that he determined the location of Dixon's patrol car based exclusively on computer-generated data,

17

that he did not know rate of error for the data, and that, if the system generated bad data, his analysis might also be bad. Moreover, the jury heard other evidence corroborating the complainant's testimony, including unobjected-to testimony that Dixon was on duty on March 15th and April 25th, that he conducted a "person check" using the complainant's name on March 15th, and that Cruz personally observed the locations where the sexual assaults occurred and found they fit the complainant's description. The jury also witnessed the complainant's in-court identification of Dixon as her assailant and heard her detailed testimony regarding the sexual assaults.

After considering the *Rodgers* criteria on these facts, we conclude that the trial court's decision to admit Cruz's testimony was within the zone of reasonable disagreement. *See Bryant v. State*, 340 S.W.3d 1, 7 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (observing that trial court's determination of witness qualifications is given great deference). We overrule Dixon's first issue.

## II. "Victim Character" Evidence

During opening statements, the State told the jurors what they would learn about the complainant during the guilt phase of trial:

> [P]robably one of the worst points of her life as a child is when her father taught her how to smoke crack cocaine. You're going to hear how [the complainant] became the person who was handed money from her father, who's sent with a friend of her father who had a car into the Third Ward in Houston to purchase crack cocaine.

18

Dixon objected to the relevance of the State's remarks, and the trial court overruled the objection. Later, after eliciting testimony from the complainant that she began using crack cocaine at a young age, the State asked her "[w]ho would obtain the crack?" Dixon made a second objection to relevance. After the trial court overruled the objection, the complainant answered that she purchased the drug for her father. In his third issue, Dixon argues that the trial court erroneously overruled his relevance objections because the complainant's testimony did not have a tendency to make a fact of consequence more or less likely but, instead, "placed a horrible image in the minds of the jurors [of] a little girl being taught to smoke crack by her father, a little girl who is then left in a crack neighborhood to become a prostitute."

Regardless of whether the trial court erred by allowing the complainant to testify that she purchased crack cocaine as a child, that testimony is cumulative of other efforts made by the State to portray the complainant as a victim. "Overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling." *Johnson v. State*, No. 01-10-00314-CR, 2011 WL 1753209, at *2 (Tex. App.—Houston [1st Dist.] May 5, 2011, pet. ref'd) (citing *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998)). Before Dixon objected to relevance, the complainant had already testified that she learned to smoke crack cocaine while living with her father at the age of fourteen or fifteen and that she and her father

19

used the drug together. And, after the trial court overruled Dixon's objection, the complainant testified without further objection that her father's friends introduced her to "dope dealers" and eventually abandoned her in the area where they bought drugs. Having no way to contact her father or to get home, the complainant stayed in that area by herself for four to five months; according to her, she "just kind of got stuck . . . and it was, like, a cycle[.]" She slept in various homes and motel rooms, where she used crack cocaine daily. To finance her drug habit, the complainant began working as a prostitute at the age of fifteen. Thus, any error in the admission of the complainant's testimony that she purchased drugs for her father was harmless because the record contains other evidence of her history of drug abuse and prostitution as a child. *See Leday*, 983 S.W.2d at 718; *Johnson*, 2011 WL 1753209, at *2.

We hold that Dixon has not shown reversible error in the admission of the evidence at trial, and we overrule his third issue.

### *Brady* **Violation**

In his second issue, Dixon contends the State withheld exculpatory information in violation of his due process rights and *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196−97 (1963). Specifically, he maintains that the State was obligated to disclose the opinion of an expert whose testimony in an unrelated case contradicted Cruz's testimony regarding the reliability and accuracy of the

20

AVL data as a means of tracking patrol car movement. Dixon raised this issue in his motion for new trial, which was overruled by operation of law. We review the trial court's ruling on the motion for new trial for abuse of discretion, and we must uphold the trial court's ruling if that ruling was within the zone of reasonable disagreement. *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). The trial court abused its discretion in denying the motion for new trial only if no reasonable view of the record could support the denial of relief. *See Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004).

The State complains that Dixon has not complied with the rules governing the presentment of a new trial motion and the consideration of evidence outside the record of a trial. Dixon replies that the clerk's record could be supplemented to include a docket sheet entry establishing presentment of his motion and an agreement between the parties that the trial court would decide whether to grant a new trial based on the parties' written submissions and without a hearing. We also note that Dixon has not provided us with any authority on whether *Brady* requires the State to disclose expert testimony given in another, unrelated case that could be used for impeachment. Even assuming the clerk's record could be supplemented to include the documents alleged by Dixon and that *Brady* applies, Dixon has not established a violation of his rights.

21

In *Brady*, the United States Supreme Court held that the suppression of evidence favorable to a defendant violates his due process rights if the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution. *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196−97; *see Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000). To establish a *Brady* violation, Dixon must show: (1) the State suppressed evidence; (2) the suppressed evidence is favorable to him; and (3) the suppressed evidence is material. *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002).

Materiality, incorporated into *Brady*'s third prong, is a requirement that Dixon must be prejudiced by the State's failure to disclose the favorable evidence. *Banks v. Dretke*, 540 U.S. 668, 691, 124 S. Ct. 1256, 1272 (2004). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense" contemplated by *Brady*. *Hampton*, 86 S.W.3d at 612 (quoting *United States v. Agurs*, 427 U.S. 97, 109−10, 96 S. Ct. 2392, 2400 (1976)). Evidence is not material if it is of such a nature that the defendant could "obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489, 104 S. Ct. 2528, 2534 (1984). Instead, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A

22

'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985); *see Thomas v. State*, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992); *Lempar v. State*, 191 S.W.3d 230, 241 (Tex. App.—San Antonio 2005, pet. ref'd) (citing *Ex Parte Richardson*, 70 S.W.3d 865, 870 n.22 (Tex. Crim. App. 2002)). Given this standard, the materiality of *Brady* evidence thus "depends almost entirely on the value of the evidence relative to the other evidence mustered by the State." *Smith v. Black*, 904 F.2d 950, 967 (5th Cir. 1990); *see also Allridge v. Scott*, 41 F.3d 213, 218 (5th Cir. 1994) (holding that when undisclosed evidence is merely cumulative of other evidence, no *Brady* violation occurs).

These conditions of materiality are not met in this case. The outside expert testimony on which Dixon relies provides that the AVL system does not record every patrol car movement; instead it only provides snapshots (i.e., intermittent transmissions of latitude and longitude coordinates that are then plotted by a technician who draws conclusions about what happened between the snapshots). He further testified that the satellite transmissions are subject to interference from weather and man-made obstacles such as buildings or tunnels, and that there is no report on the accuracy of the system as means of tracking patrol car movement. But the snapshots indicating the lack of movement in Dixon's patrol car were the focus of Cruz's testimony, not the specific routes of travel. Dixon's counsel cross-

examined Cruz at trial regarding the reliability of the AVL data as a means of tracking patrol car movement. Additionally, Dixon could have—but did not—call an expert to rebut Cruz's testimony. Thus, while additional expert testimony on the reliability or accuracy of the AVL system may have aided the jury in assessing the weight of Cruz's testimony, Dixon points to no piece of exculpatory evidence that—had it been disclosed and introduced in a motion for new trial—would have undermined confidence in the jury's verdict. We hold that the trial court could reasonably conclude that the additional expert testimony was not material or exculpatory. Because Dixon did not establish a *Brady* violation, we overrule his second issue.

## Conclusion

Having overruled each of Dixon's issues on appeal, we affirm the trial court's judgment.

Harvey Brown
Justice

Panel consists of Justices Bland, Massengale, and Brown.

Do not publish. TEX. R. APP. P. 47.2(b).