(No. 75570.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WILLIAM FRANKLIN, Appellant.

*Opinion filed June 22, 1995.—Rehearing denied October 2, 1995.*

4

Kim Robert Fawcett, Assistant Appellate Defender, of the Office of the State Appellate Defender, and Larry Carlson and Marshall J. Hartman, all of Chicago, for appellant.

Roland W. Burris and James E. Ryan, Attorneys General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee G. Goldfarb, William D. Carroll and Sally L. Dilgart, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

The defendant, William Franklin, was convicted by a jury in the circuit court of Cook County for the murder of Elgin Evans, Jr. The same jury found defendant eligible for the death penalty on the basis of having previously been convicted of a murder in addition to the murder of Evans. (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(3).) After hearing evidence in aggravation and mitigation, the jury determined that there were no mitigating circumstances sufficient to preclude imposition of the death penalty.

Defendant's conviction and death sentence were affirmed by this court on direct appeal in *People v. Franklin* (1990), 135 Ill. 2d 78. The United States Supreme Court subsequently denied *certiorari*. (*Franklin v. Illinois* (1990), 498 U.S. 881, 112 L. Ed. 2d 182, 111 S. Ct. 228.) On February 28, 1991, the defendant filed a peti-

tion for post-conviction relief. The defendant then filed an amended petition and a supplemental petition to the amended petition. The State filed motions to dismiss all of the defendant's petitions. After holding an evidentiary hearing on the defendant's claim that prosecutorial misconduct occurred when the prosecutor entered the jury room, the circuit court of Cook County found that a prosecutor did not enter the jury room and the court subsequently denied all of defendant's post-conviction claims for relief. This court has jurisdiction over the instant appeal pursuant to Supreme Court Rule 651(a). 134 Ill. 2d R. 651(a).

The facts of this case are adequately set forth in the opinion on the defendant's direct appeal (*People v. Franklin* (1990), 135 Ill. 2d 78) and will be repeated here only as necessary. The body of Elgin Evans, Jr., was found on February 6, 1980. He had been shot once in the right side of his head and once in the left side of his chest. At trial Ulric "Buddy" Williams testified that he was at the home of Marion Holmes when defendant drove up. Defendant told Williams that Evans was in the car, and then defendant went inside to speak with Holmes. After coming back outside, defendant and Holmes told Williams that they were going to take a ride in the car and that Williams was to drive. Holmes told Williams where to drive. When they reached the desired location, Holmes, Evans and defendant got out of the car and went to the trunk supposedly to dispose of stolen auto parts. Williams was told to stay in the car. Williams stated that in the rearview mirror, he saw defendant pull a gun from his jacket pocket and shoot Evans in the head. He then saw defendant bend over Evans and he heard another gun shot. In exchange for his truthful testimony in the instant case and in the trial of Marion Holmes, Williams stated, he agreed to plead guilty to a separate armed robbery charge, to receive a sentence of

six years for this armed robbery, and to be relocated with his family after his release from prison.

## POST-CONVICTION PROCEEDINGS

A proceeding brought under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1991, ch. 38, par. 122—1 *et seq.*) is not a direct appeal, but a collateral attack on a judgment of conviction. The proceeding is limited to constitutional issues which have not been, and could not have been, presented on direct review. (*People v. Winsett* (1992), 153 Ill. 2d 335, 346.) A defendant bears the burden of establishing a substantial denial of his rights under the United States Constitution or the Illinois Constitution. (*People v. Odle* (1992), 151 Ill. 2d 168, 172.) A defendant is not entitled to an evidentiary hearing on his petition unless the allegations in the petition are supported by the trial record and by accompanying affidavits and show a substantial violation of constitutional rights. Determinations made by a reviewing court on the prior direct appeal are *res judicata* as to issues actually decided; issues that could have been presented on direct review, but which were not, are deemed waived for purposes of post-conviction review. On review, the trial court's determinations will not be disturbed unless manifestly erroneous. *People v. Silagy* (1987), 116 Ill. 2d 357, 365.

On appeal, the defendant argues that the circuit court erred in dismissing his post-conviction petition without granting a full evidentiary hearing or relief. Specifically, defendant contends that (1) he was denied a fair trial, as the prosecution misled the jury by failing to disclose that Buddy Williams testified against him with an expectation of leniency and that Williams was an accomplice to the murder; (2) defense counsel was ineffective as he was under criminal investigation at the time of trial; (3) his Federal due process rights were violated and defense counsel was ineffective since

defense counsel failed to request an instruction that the alternative sentence to death was natural life in prison without parole; (4) defense counsel was ineffective for failing to investigate, prepare and present mitigation evidence at sentencing; (5) the post-conviction court erred in finding his past Federal prison records irrelevant to the post-conviction proceedings; (6) counsel was ineffective for failing to make a plea for mercy at sentencing; (7) the jury instructions used at sentencing were unconstitutional; and (8) a prosecutor improperly entered the jury room during deliberations, causing him substantial prejudice. We find that the trial court's denial of the defendant's post-conviction petition, after conducting an evidentiary hearing on only the claim that the prosecutor entered the jury room, is amply supported by the record and by Illinois law. Accordingly, we affirm.

## DENIAL OF A FAIR TRIAL

Defendant claims that he was denied a fair trial, because the State misled the jury about Buddy Williams' true involvement in the crime by stating that Williams was an innocent bystander rather than an accomplice and because the State failed to tell the jury that Williams was testifying under a hope of leniency in not being prosecuted for the murder. Defendant contends that the post-conviction circuit court was governed by the case of *People v. Holmes* (1992), 238 Ill. App. 3d 480. Holmes, a codefendant in the instant case, was found guilty of Evans' murder by a jury on a theory of accountability and sentenced to 40 years in prison. On appeal, the appellate court reversed Holmes' conviction. The appellate court found that Williams was an accomplice to the murder. Since the State knew that Williams was not an innocent bystander to the murder, the court ruled that the State misled the jury by not informing the jury of Williams' true involvement. Thus, Holmes

was entitled to a new trial. The appellate court also found that Williams was operating under an expectation of leniency of not being charged with Evans' murder at the time of Holmes' trial. Thus, the State was required to disclose to the jury that Williams had hopes and expectations of leniency in not being charged with the murder. *Holmes*, 238 Ill. App. 3d at 489-91.

Defendant also supports his claim with the statement which Williams gave to Will County authorities. Defendant contends that the statement provided the State with knowledge of Williams' true involvement in the crime. In the statement, Williams discusses how he, Holmes, and Franklin had looked for Evans several days before the murder because Evans had supposedly robbed a lounge owned by an associate of Holmes. The man who owned the lounge paid to have Evans killed and Holmes had killed other people for this man. Williams stated that he knew Holmes was "supposed to whoop his [Evans'] ass or break his nose or something." Defendant contends that since the State knew from this statement that Williams was not an innocent bystander, the State had a duty to tell the jury that Williams was an accomplice.

Although not phrasing his argument in the exact terms, defendant attempts to apply the *Holmes* decision to his post-conviction proceedings through the doctrine of collateral estoppel. The doctrine of collateral estoppel applies " 'when a party or someone in privity with a party participates in two separate and consecutive cases arising on *different* causes of action and some controlling fact or question material to the determination of both causes has been adjudicated against that party in the former suit by a court of competent jurisdiction.' " (Emphasis in original.) (*People v. Moore* (1990), 138 Ill. 2d 162, 166, quoting *Housing Authority v. Young Men's Christian Association* (1984), 101 Ill. 2d 246, 252.) The

threshold requirements for collateral estoppel are that
(1) the issue decided in the prior adjudication is identi-
cal with the one presented in the suit in question; (2)
there was a final judgment on the merits in the prior
adjudication; and (3) the party against whom estoppel is
asserted was a party or in privity with a party to the
adjudication. (*In re Owens* (1988), 125 Ill. 2d 390, 399-
400.) Absent from this list of requirements is the
mutuality requirement. Under the mutuality doctrine,
neither party could use a prior finding as an estoppel
against their opponent unless both parties were bound
by the prior judgment. (*Owens*, 125 Ill. 2d at 398.) This
court removed the mutuality requirement from the doc-
trine of collateral estoppel in the civil case of *Illinois
State Chamber of Commerce v. Pollution Control Board*
(1979), 78 Ill. 2d 1, 7. See *Owens*, 125 Ill. 2d at 398.

Our own criminal cases and those of our appellate
court involving collateral estoppel have not mentioned
the mutuality requirement. However, in these estoppel
cases the party asserting the doctrine was, in fact, a
party to the prior proceeding. That is not the scenario
we are confronted with in the instant case. We are pre-
sented with a unique set of circumstances in which one
defendant attempts to use the reversal of another
defendant's conviction to his own benefit. This court has
cautioned against the unlimited use of offensive collat-
eral estoppel in civil cases, as there is no longer the
requirement of mutuality of parties. *Owens*, 125 Ill. 2d
at 398-99 (giving circuit courts in civil cases the discre-
tion to ensure that the use of offensive collateral estop-
pel is not fundamentally unfair to a party).

A review of the law of neighboring jurisdictions has
not revealed any cases with the same scenario with
which we are presented. Many courts, however, have
been confronted with the question of whether a defen-
dant can use the acquittal of a codefendant in his own

favor. Most of these courts have held that a defendant cannot use the acquittal to his own benefit and have required that the defendant seeking to assert collateral estoppel actually have been a party to the prior litigation. (See, *e.g.*, *Standefer v. United States* (1980), 447 U.S. 10, 64 L. Ed. 2d 689, 100 S. Ct. 1999; *State v. Jimenez* (1981), 130 Ariz. 138, 634 P.2d 950; *People v. Allee* (Colo. 1987), 740 P.2d 1; *Kott v. State* (Alaska 1984), 678 P.2d 386; *Potts v. State* (Fla. 1982), 430 So. 2d 900; *Commonwealth v. Cerveny* (1982), 387 Mass. 280, 439 N.E.2d 754; but see *People v. Taylor* (1974), 12 Cal. 3d 686, 527 P.2d 622, 117 Cal. Rptr. 70 (lack of identity of parties does not preclude application of doctrine of collateral estoppel when defendant's guilt is predicated on his vicarious liability for the acts of previously acquitted codefendants); *State v. Gonzalez* (1977), 75 N.J. 181, 380 A.2d 1128 (facts of case required that defendant be afforded benefit of earlier suppression hearing ruling that evidence was inadmissible against codefendant).) The majority of courts have provided numerous justifications for imposing a mutuality requirement, including that the State often lacks the full and fair opportunity to litigate an issue that is accorded a party in a civil case, because of the statutory and constitutional privileges granted a criminal defendant. See *Standefer*, 447 U.S. at 21-25, 64 L. Ed. 2d at 698-701, 100 S. Ct. at 2006-08; *Allee*, 740 P.2d at 7.

We adopt the reasoning of these courts which mandate a mutuality requirement and also apply this reasoning to the instant set of facts. We note that in the civil case of *Illinois State Chamber of Commerce*, this court did not discuss or analyze the necessity of a mutuality requirement in criminal cases. The requirement of mutuality should be retained in criminal cases, because the State often lacks the full and fair opportunity to litigate an issue. For instance, the prosecu-

tion's discovery rights in a criminal case are limited by rules of the court and by constitutional privileges. Evidentiary rules often prevent the State from presenting all of its evidence against one defendant; evidence which is admissible against one defendant may not be admissible against another defendant. The suppression or limited use of evidence may result in the acquittal or reversal of conviction of one defendant. In addition, the evidence presented at separate trials and the manner in which that evidence is presented may be significantly different and will rarely, if ever, be identical. The State may also not present its case as effectively or persuasively in one trial or appeal as it does in another. (See *Standefer*, 447 U.S. at 21-25, 64 L. Ed. 2d at 2006-08, 100 S. Ct. at 698-701; *Allee*, 740 P.2d at 7.) The acquittal of a codefendant or the reversal of a codefendant's conviction does not establish a status of innocence and should not be given conclusive effect against the State in favor of a stranger to that trial. In addition, criminal cases involve an important consideration wholly absent from civil cases—the interest in the enforcement of the criminal law. (See *Allee*, 740 P.2d 1.) The public has a strong interest in the accuracy of the results of every criminal prosecution and criminal appeal and this public interest outweighs any need for the appearance of consistent verdicts. Thus, the fundamental differences between the separate trials and appeals of two codefendants support the requirement of mutuality in criminal cases.

Allowing the defendant to use the *Holmes* opinion in his favor encourages the defendant, and others like him, to adopt a wait-and-see attitude rather than bringing the claims himself. Since the defendant was not a party to the trial of Holmes or the appeal of Holmes' conviction, the defendant cannot now use the *Holmes* opinion to his benefit. As mutuality of parties does not exist, the post-conviction circuit court was not required to apply the *Holmes* opinion to defendant's claims.

Defendant also contends that due process requires that he receive a new trial because of the State's errors. Defendant partially relies on the appellate court analysis in the *Holmes* opinion for this contention. The State argues that defendant has waived this issue for failing to bring it on direct appeal. Defendant responds first by stating that this issue is not waived, because its resolution depends on materials not in the appellate court record (the *Holmes* opinion, the Will County statement, and a transcript of Williams' testimony from *Holmes* and defendant's preliminary hearing), second by stating that if waiver is found, fundamental fairness requires relaxation of the waiver doctrine, and third by arguing that if the issue is waived, then appellate counsel was ineffective for failing to bring the issue on direct appeal.

Defendant has waived this issue for failure to bring it on direct review. Defendant had access to the Will County statement and the transcript of the preliminary hearing during his trial, as evidenced by defense counsel's attempt to question and impeach Williams with both of these documents during cross-examination. Defendant could have brought this claim on direct review, much like Holmes brought these claims on the appeal of his case.

In addition, the doctrine of fundamental fairness does not support relaxation of the waiver rule. Fundamental fairness is generally defined in terms of a "cause and prejudice" test. (*People v. Flores* (1992), 153 Ill. 2d 264, 279.) Defendant has failed to provide argument sufficient to support the "cause and prejudice" test. Defendant has simply made a blatant statement that fundamental fairness requires relaxation of the waiver rule and has not provided additional argument. In addition, our review of the record reveals that the defendant was not denied a fair trial by the State's actions. First, the State did not mislead the jury about Williams' involve-

ment in the crime. The State did not characterize Williams as an "innocent bystander" to the commission of a crime; in fact, the State did not even use that phrase. During opening and closing arguments the State simply recited the testimony which Williams was to give and gave at trial. The evidence of defendant's involvement in the murder was also in front of the jury, as Williams had testified to looking for Evans several days before the murder and driving the car to the murder scene. The jury was free to decide whether or not Williams was involved and, thus, the extent of defendant's involvement. Second, the State did tell the jury about the deal which had been made with Williams—that in exchange for his truthful testimony, Williams would receive a six-year sentence in an unrelated armed robbery charge. Any other hopes or expectations Williams had about not being charged for the murder were just that. There is no evidence of any other agreement between Williams and the State. The State was not required to speculate about what Williams was thinking or believing in regard to his being charged for the murder and then to relate these speculations to the jury.

Finally, defendant has also failed to prove that appellate counsel was ineffective for failing to bring these claims on direct review. In light of the above analysis, defendant has not shown that but for counsel's alleged errors that his conviction would have been reversed. See *People v. Stewart* (1990), 141 Ill. 2d 107, 119.

### CRIMINAL INVESTIGATION OF COUNSEL

Defendant claims that he should be granted a new trial because his lawyer, Cary Polikoff, was the subject of a Federal criminal investigation involving "Operation Greylord" and the fixing of cases in Cook County circuit court prior to and during his trial. Defendant asserts that his conviction should be reversed in the interests of justice and because the investigation of Po-

likoff caused Polikoff to render ineffective assistance of counsel. In support of the latter position, defendant's post-conviction petition listed a minimum of 13 reasons for finding that counsel was ineffective.

To support his contention that the interests of justice require a new trial, defendant relies on the case of *People v. Williams* (1982), 93 Ill. 2d 309. *Williams* was a capital case in which defense counsel represented three of four defendants. Two juries were impaneled and the trials were held simultaneously, with counsel representing defendants before both juries. At the same time, counsel also had complaints pending against him before the Attorney Registration and Disciplinary Commission (ARDC). This court subsequently overturned the defendant's conviction, finding that counsel's problems in front of the ARDC in conjunction with the complex nature of the capital case may have prevented the defendant from receiving the effective assistance of counsel guaranteed by the Constitution. Because of the uniqueness of the situation, this court declined to apply the tests for ineffective assistance of counsel established in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. This court went on to say that "considering the unique circumstances and sequence of events in this capital case, which will *rarely, if ever, be duplicated*, that the interests of justice require that Dennis Williams be granted a new trial." (Emphasis added.) *Williams*, 93 Ill. 2d at 325.

Later, in *People v. Szabo* (1991), 144 Ill. 2d 525, 529, this court held "that the *Williams* decision was an aberration peculiar to the facts of that case." This court also noted the factual differences between the two cases. The defendant's post-conviction petition in *Szabo* contained only two brief paragraphs alleging counsel's deficient representation and did not compare favorably with the list of counsel errors alleged in *Williams*. In addition,

Szabo's counsel did not appear before the ARDC until 10 months after defendant's trial, while Williams' counsel was the subject of disbarment proceedings at the time of his trial. This court declined to apply a *per se* rule that whenever counsel is involved in proceedings with the ARDC interests of justice require that the defendant be granted a new trial. Rather, this court reviewed the defendant's claims under the *Strickland* ineffective assistance of counsel test. *Szabo,* 144 Ill. 2d at 530-31.

Although both *Williams* and *Szabo* involved attorneys who were facing proceedings in front of the ARDC, the analysis in those cases is applicable to an attorney who is being investigated for criminal infractions. The "unique circumstances and sequence of events" in *Williams,* however, are not present in the instant case. The circumstances surrounding the investigation of Polikoff are different from the disbarment of the attorney in *Williams.* Knowledge of the investigation of "Operation Greylord" became public in November of 1986 through a series of newspaper articles. Defendant claims that the publicity surrounding the investigation and Polikoff's subsequent indictment for his involvement in the scheme caused Polikoff to perform deficiently and automatically require that a new trial be granted in the interests of justice.

Defendant, however, has failed to meet his burden of proof on this issue. Defendant has only provided evidence of publicity surrounding Joseph McDermott's involvement in the investigation. Defendant has not provided proof of publicity surrounding Polikoff's involvement in the scheme, nor has defendant provided proof that Polikoff had been indicted for his involvement before or at the time of his trial. In actuality, as evidenced by the number "87" prefix on Polikoff's Federal indictment, Polikoff was, at most, only under

investigation for his involvement in "Operation Greylord" at the time of defendant's trial. He was not indicted until after the conclusion of defendant's trial and he did not plead guilty to any charges until some time later. Being under a criminal investigation is not of the same degree as appearing in front of the ARDC on current, pending complaints. (See *Szabo*, 144 Ill. 2d 525.) In addition, Polikoff did not appear in front of the ARDC at the time of defendant's trial. Polikoff was disbarred on December 15, 1988, two years after the trial.

The circumstances of defendant's trial are also different from the circumstances of Williams' trial. Although both were trials of capital cases, defendant was the only person whom Polikoff was representing and the only person on trial. Thus, the instant circumstances are more similar to the *Szabo* case than to the *Williams* case. The circumstances surrounding the investigation of Polikoff and the nature of defendant's trial do not meet the unique set of circumstances found to exist in *Williams*. Thus, defendant does not have a right to a new trial in the interests of justice.

As in *Szabo*, however, defendant's claims of ineffective assistance of counsel must be analyzed in terms of *Strickland*. *Strickland* established a two-prong test for judging attorney performance, of which the defendant must prove both prongs. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) The defendant must first show that "counsel's performance was deficient" in that it "fell below an objective standard of reasonableness," and second that the "deficient performance prejudiced the defense" such that the defendant was deprived of a fair trial whose result was reliable. (*Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) The *Strickland* test also requires "a reasonable probability of a different result, not merely a possibil-

ity" of a different result. (*People v. Gacy* (1988), 125 Ill. 2d 117, 129-30.) A defendant's claims of ineffectiveness can often be disposed of upon a showing that the defendant suffered no prejudice from the claimed errors, without reaching a decision on whether the errors constituted constitutionally ineffective assistance of counsel. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

Several of the claims which defendant makes in his post-conviction petition regarding the ineffectiveness of his counsel were raised and discussed on direct appeal. Several of the other claims are analyzed later in this opinion and, for still others, defendant has failed to raise and to provide argument for them in his brief. A point raised in a brief but not argued or supported by citation to relevant authority fails to satisfy the requirements of Supreme Court Rule 341(e)(7) (134 Ill. 2d R. 341(e)(7)) and is therefore waived. (*People v. Patterson* (1992), 154 Ill. 2d 414, 455.) The two remaining claims of ineffective assistance of counsel are whether counsel was ineffective when he failed to impeach Buddy Williams with the statement he made to Will County authorities and whether counsel was ineffective for failing to request an accomplice witness instruction.

Defendant has waived the issue of whether defense counsel was ineffective for failing to impeach Williams with the Will County statement by failing to bring this issue on direct review. The strict application of the waiver doctrine may be relaxed where fundamental fairness so requires. As mentioned, fundamental fairness is analyzed in terms of "cause and prejudice." (*Flores*, 153 Ill. 2d at 279.) "Cause" has been defined as an objective factor that impeded defense counsel's efforts to raise the claim on direct review. "Prejudice" is defined as an error which so infected the entire trial that the defendant's conviction violates due process. Satisfaction of the

"cause and prejudice" test will excuse the defendant's procedural default. *Flores*, 153 Ill. 2d at 279.

In the instant case, the defendant has not established either "cause" for or "prejudice" resulting from the procedural default that resulted in the waiver of his claim. The defendant has not offered any persuasive reasons supporting why he failed to raise this claim until the post-conviction proceedings. Defendant has couched this contention in terms of the criminal investigation of Polikoff. This investigation, however, did not prevent a different appellate counsel from bringing the claim. The above analysis regarding the *Williams* and *Szabo* cases also shows that defendant's post-conviction method of raising this claim is frivolous.

Nor was defendant prejudiced by counsel's failure to impeach Williams with the statement. Defendant lists 12 ways in which the statement could have been used to impeach Williams. Many of these involve specific instances of the bad conduct of both Williams and Holmes. A witness can be impeached by attacking his character, but only criminal convictions can be used for this purpose: proof of arrests, indictments, charges or the actual commission of a crime are not admissible. (*People v. Lucas* (1992), 151 Ill. 2d 461, 491.) The bad acts to which Williams admitted in the Will County statement could not be used for impeachment purposes. Counsel was not ineffective for failing to attempt to use the statement to impeach Williams on these matters, and defendant did not suffer prejudice as a result of counsel's inactions.

Defendant also contends that the statement could be used to show that Williams knew that Evans was going to be severely injured or killed and that Williams lied when he testified that the murder was a surprise. Defendant refers to that portion of the Will County statement where Williams stated that he knew Holmes was

"supposed to whoop his [Evans'] ass or break his nose or something." Defendant, however, has not suffered prejudice by defense counsel's failure to use this portion of the statement. Generally, the decision of whether or not to cross-examine or impeach a witness is a matter of trial strategy, which cannot support a claim of ineffective assistance of counsel. (See *People v. Anderson* (1994), 266 Ill. App. 3d 947, 956.) Defense counsel could have reasonably believed that it was not necessary to impeach Williams with this portion of the statement, as Williams had already answered affirmatively on cross-examination when asked whether the murder of Evans was a "hit." (See *Franklin*, 135 Ill. 2d at 101.) Thus, counsel's actions in not using the statement were a matter of trial strategy and did not amount to an error so egregious as to affect the outcome of defendant's trial. Therefore, defendant has not shown "cause and prejudice" sufficient to overcome the waiver doctrine.

The second ineffective-assistance-of-counsel claim is that defense counsel was ineffective for failing to request an accomplice witness instruction. On direct review this court found that the fact that murder charges against Williams were dismissed after a finding of no probable cause at Williams' preliminary hearing suggests to reasonably competent counsel that Williams did not act as an accomplice. (*Franklin*, 135 Ill. 2d at 104.) Thus, defense counsel's reliance on the no-probable-cause finding in deciding whether or not to tender the accomplice witness instruction could not be deemed ineffective assistance. (*Franklin*, 135 Ill. 2d at 104.) Defendant now contends that this determination is not *res judicata* to his post-conviction proceeding because the *Holmes* court found that Williams was an accomplice and the *Holmes* opinion constitutes new evidence which could not have been presented on direct review. Due to the resolution of defendant's claims regarding the *Holmes* opinion, the

defendant's assertions are precluded *res judicata* by the previous appeal in this cause.

## INSTRUCTION ON ALTERNATIVE SENTENCE TO DEATH

The defendant argues that he was denied a fair sentencing hearing because the jury was not instructed that the alternative sentence to a sentence of death is natural life in prison without parole. In *People v. Gacho* (1988), 122 Ill. 2d 221, this court held that the jury must be told that if it finds mitigating factors sufficient to preclude the imposition of the death penalty, then the defendant will be sentenced to natural life imprisonment without parole. The rule adopted in *Gacho,* however, applies only prospectively. (*Gacho,* 122 Ill. 2d at 262-63.) As defendant's sentencing hearing took place before this court's decision in *Gacho,* no error occurred when the circuit court failed to give a natural life instruction. *Franklin,* 135 Ill. 2d at 113.

Defendant requests that this court apply the *Gacho* rule to his case under the retroactivity doctrine announced in *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708, or the doctrine announced in *Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967. Defendant also argues that the *Gacho* rule should be adopted as a constitutional rule of criminal procedure under the due process clause of the Illinois Constitution. Defendant's *Griffith* claims were considered and rejected on direct review and are thus barred by *res judicata* principles. (See *Franklin,* 135 Ill. 2d at 114.) In addition, a defendant cannot obtain relief under the Post-Conviction Hearing Act by rephrasing previously addressed issues in constitutional terms. (*People v. Silagy* (1987), 116 Ill. 2d 357, 371.) Defendant has waived any other constitutional bases for retroactive application of *Gacho* by failing to raise these bases on direct review. We note in passing that this court has

consistently held that a jury instruction on the alternative mandatory sentence of natural life in prison is a statutory and not a constitutional right. (See, *e.g.*, *People v. Steidl* (1991), 142 Ill. 2d 204, 245.) Thus, the due process clause of the Illinois Constitution has no application to claims made with respect to *Gacho*.

Defendant also contends that the failure to give an alternative instruction violated his rights under the eighth and fourteenth amendments of the Federal Constitution. The Supreme Court recently held that a defendant's due process rights require that the sentencing jury be informed, via argument or instruction, that the alternative sentence to death is natural life in prison without parole, if the State places the defendant's future dangerousness at issue. (*Simmons v. South Carolina* (1994), 512 U.S. 154, 129 L. Ed. 2d 133, 114 S. Ct. 2187.) In *Simmons*, the prosecution raised the issue of the defendant's future dangerousness during closing argument by asking the jury "what to do with [petitioner] now that he is in our midst" and by further urging that a death sentence would be "a response of society to someone who is a threat. Your verdict will be an act of self-defense." *Simmons*, 512 U.S. at 157, 129 L. Ed. 2d at 139, 114 S. Ct. at 2190-91.

Although a dispute exists among the Federal circuits whether the rule enunciated in *Simmons* applies retroactively, we need not reach that issue. (Compare *Allridge v. Scott* (5th Cir. 1994), 41 F.3d 213, 222, and *Kinnamon v. Scott* (5th Cir. 1994), 40 F.3d 731, 733, with *Del Vecchio v. Illinois Department of Corrections* (7th Cir. 1994), 31 F.3d 1363, 1397 (Cummings, J., dissenting, joined by Cudahy, Ripple, and Rovner, JJ.).) A thorough review of the record in the instant case reveals that the prosecution did not place the defendant's future dangerousness at issue during the second stage of the sentencing hearing. Although the prosecution did state that the

defendant had violated his parole in the past, these statements were made in the context of explaining defendant's past criminal history as an aggravating factor. The prosecution did not ask the jury what to do with the defendant now that he had been convicted of murder, did not state that society needed to be protected from the defendant, did not argue that the defendant was bound to commit crimes in the future if not sentenced to death, and did not state that a sentence other than death would leave any future decisions up to the experts. Thus, the defendant was not entitled to an instruction that the alternative sentence to death was natural life imprisonment. As defendant was not entitled to the instruction, his claim that counsel was ineffective for failing to request the instruction likewise fails.

## INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING

Defendant raises several claims regarding the effectiveness of his trial counsel at the second stage of the sentencing hearing. First, defendant claims that counsel was ineffective for failing to conduct an investigation for mitigation evidence and for presenting only the testimony of his children in mitigation. In conjunction with this claim, defendant claims that the trial court erred in ruling that defendant's past Federal prison records were irrelevant and could not be discovered during the post-conviction proceedings. Defendant hoped to use these records to obtain more mitigation evidence which could have proven counsel's ineffectiveness. Finally, defendant argues that trial counsel was ineffective for failing to argue for mercy and that his life should be spared.

The test established in *Strickland* also applies to the sentencing phase of a defendant's trial. In the context of a death sentencing hearing, the defendant must specifi-

cally prove that there is a reasonable probability that, but for counsel's deficient performance, the sentencer would have concluded after weighing the aggravating and mitigating factors that a sentence of death was not warranted. *People v. Hampton* (1992), 149 Ill. 2d 71, 109.

Defendant asserts that had counsel conducted an investigation, counsel would have been able to present mitigation evidence of (1) comments of other members of his family who characterized him as a good-hearted, loving, and caring person; (2) his mental illness, which included hallucinations, delusions and disorientation, and which had been diagnosed as schizophrenia in remission and paranoid character disorder; (3) his family's history of mental illness and violence, including the fact that his father had previously murdered someone; and (4) his completion of an associates degree and near completion of a bachelor's degree while in prison. We conclude that there is no reasonable probability that, absent trial counsel's allegedly deficient performance in presenting the above evidence or the post-conviction court's allegedly incorrect ruling on the release of the prison records, the sentencer would have found that the mitigating circumstances precluded the imposition of the death penalty.

At the second phase of the sentencing hearing, the State detailed the defendant's past criminal behavior. In June of 1965, defendant pled guilty to the offense of possession of a narcotic drug and received three years' probation. In October of 1965, defendant pled guilty to bank robbery and was sentenced to 15 years in Federal prison. He was paroled in 1970, but subsequently violated his parole. In 1980, defendant was convicted of burglary and bail jumping. In 1982, defendant was convicted of the murder of James Roland and sentenced to a period of 100 to 300 years in the penitentiary. The State also offered the evidence adduced during the guilt phase of defendant's trial by way of stipulation.

The defense offered mitigation evidence through the testimony of seven of defendant's children. The children testified about the positive influence defendant had on their lives and the role that their father played in their lives, especially in terms of stressing the importance of an education.

A review of the record reveals that trial counsel's alleged deficiency in failing to offer the comments of other members of defendant's family who would testify as to defendant's good nature would have been merely cumulative of the testimony of defendant's children. The proffered evidence regarding defendant's psychological problems and his family's violent and psychological history was not inherently mitigating. (See *People v. Henderson* (1990), 142 Ill. 2d 258, 340-41.) Although this evidence could have evoked compassion in the jurors, it could have also demonstrated defendant's potential for future dangerousness and the basis for defendant's past criminal acts. The evidence of defendant's mental illness may also have shown that defendant was less deterrable or that society needed to be protected from him.

Defendant did earn an associate's degree while in Federal prison on the bank robbery charge. Although defendant had earned this degree and had almost earned a bachelor's degree, he subsequently committed several crimes while on parole from Federal prison. While the jurors could have applauded defendant for bettering his education, the jurors could have discounted this evidence because of the defendant's criminal acts after obtaining the degrees. The defendant's children testified in mitigation about how their father stressed the importance of education and believed that he was forced to commit crimes since he was not well educated. Yet after obtaining an associates degree and being released on parole, the defendant committed several crimes, including two murders. The jury may have thought that

defendant's schooling was contradictory to his subsequent criminal acts. Thus, the evidence of defendant's education while in prison was not necessarily mitigating.

Likewise, the post-conviction court did not err in failing to release defendant's past Federal prison records. Even if these records had shown defendant's good adjustment to prison, they could have been discounted by the jury similarly to the evidence of defendant's educational achievements. Therefore, we conclude that the absence of the alleged deficiencies of trial counsel regarding mitigation evidence or the alleged evidentiary errors by the post-conviction court would not have created a reasonable probability of a different sentence. The post-conviction court acted correctly in dismissing defendant's claims of ineffective assistance of counsel on this basis and in dismissing his request for the Federal prison records.

Defendant's other contention regarding ineffective assistance of counsel at sentencing is that counsel failed to make a plea for mercy. This court on direct review found that counsel was not ineffective at sentencing and that counsel characterized defendant as loving and kind. (*Franklin*, 135 Ill. 2d at 118-19.) The post-conviction court noted this finding and also found that counsel did humanize defendant and did ask the jury to view defendant as a person whose life was worth saving. A review of the record reveals that the post-conviction court did not err in dismissing defendant's contention. Counsel stated that "nothing would be served by sending William Franklin to his death" and that "there is some good in this individual in spite of the things he did." Counsel also asked the jury to resolve the matter "in a way that does not bespeak of vengeance and cruelty and premeditation." Thus, the post-conviction court's determination that counsel did make a plea for mercy is not manifestly erroneous and will not be overturned.

## CONSTITUTIONALITY OF SENTENCING INSTRUCTIONS

Defendant asserts that the jury instructions given at his sentencing hearing violated his constitutional rights in that the instructions failed to adequately inform the jury. Defendant supports his claim with the statement of one juror who said he was confused as to the need for a unanimous verdict and the case of *United States ex rel. Free v. Peters* (N.D. Ill. 1992), 806 F. Supp. 705.

The decision in the *Free* case has been reversed and its reasoning rejected. (*Free v. Peters* (7th Cir. 1993), 12 F.3d 700.) This court has found the analysis employed by the Seventh Circuit Court of Appeals to be sound. (*People v. Kokoraleis* (1994), 159 Ill. 2d 325, 333-34.) As the defendant has provided no persuasive reasoning to reject that holding, we decline to revisit an analysis of the issue at this time. In addition, this court found on direct review that the jury was correctly instructed on and given the correct verdict form regarding a unanimous verdict. (*Franklin*, 135 Ill. 2d at 115-16.) Thus, the post-conviction court did not err in dismissing defendant's claim of unconstitutional instructions or his request for the appointment of an expert who would conduct a new juror survey on the instructions.

## PROSECUTORIAL MISCONDUCT

Defendant claims that when the jury was deliberating over whether the defendant was eligible for the death penalty in phase one of the sentencing hearing, a prosecuting attorney came into the jury room, interrupted the jury deliberations and congratulated the jury on rendering the guilty verdict. The prosecutor then allegedly handed the jurors photos of the two men whom defendant had killed. In support of his position, defendant offered the affidavit of one juror who stated that a prosecutor actually entered the jury room.

The trial court held a post-conviction evidentiary

hearing on this claim. At the conclusion of the hearing, the circuit judge rejected the claim, finding that there was no credible factual basis for the allegations. The trial court accepted the juror's contention that he had been harassed into signing the affidavit by a defense investigator. After reviewing the testimony from the evidentiary hearing, we find that the trial judge's determination is not against the manifest weight of the evidence. The testimony plainly establishes that the juror was hounded into signing the affidavit by a defense investigator and that a prosecutor did not enter the jury room. Thus, the trial court properly dismissed the defendant's request for the release of the juror cards and the opportunity to examine other jurors at a subsequent hearing.

Finally, we note that the last 22 counts of defendant's amended petition for post-conviction relief are claims that this court addressed on direct review. These claims cannot be reargued here (*People v. Albanese* (1988), 125 Ill. 2d 100, 105) and defendant has preserved them only for purposes of Federal review.

## CONCLUSION

For the reasons set out above, we affirm the decision of the circuit court to dismiss defendant's post-conviction petition. The clerk of this court is directed to enter an order setting Tuesday, November 21, 1995, as the date on which the sentence of death, entered in the circuit court of Cook County, is to be carried out. Defendant shall be executed in the manner provided by law. (Ill. Rev. Stat. 1991, ch. 38, par. 119—5.) The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is now confined.

*Affirmed.*

JUSTICE McMORROW, dissenting:

The gravamen of the defendant's petition for post-conviction relief lies in two pretrial statements of Buddy Williams, the State's key witness who testified against the defendant. A careful reading of these two statements reveals that Williams was an accomplice in the murder of Elgin Evans and had a motive or bias for testifying against the defendant. Williams' motive was an expectation of favorable treatment in exchange for his testimony against the defendant in the prosecution of the Evans murder. The failure to disclose to the jury Williams' bias and motive to testify falsely violated fundamental principles of due process.

The primary issue in the case at bar is whether the defendant's due process rights were violated. The appellate court, in the appeal of the conviction of the codefendant, Marion Holmes, held that Holmes was entitled to a new trial because the failure to disclose Williams' expectation of leniency, under the facts of this case, denied Holmes a fair trial. (*People v. Holmes* (1992), 238 Ill. App. 3d 480.) The majority of this court relies upon principles of collateral estoppel to deny the defendant a new trial, the same relief that Holmes received from the appellate court under the same facts. However, reliance on collateral estoppel principles does not consider the defendant's due process rights. The collateral estoppel issue is a secondary issue relevant only to whether the State is estopped from contesting issues decided by the appellate court in *Holmes*. Because the primary issue before us is whether the defendant's due process rights were violated, the majority's analysis of estoppel principles fails to dispose of the central issue in this case. An examination of the facts of this case and an application of the holdings in *People v. Jimerson* (1995), 166 Ill. 2d 211, and *People v. Holmes* reveals that the defendant's due process rights were violated.

At the defendant's trial, Williams testified that on

the day of the murder, he was at the home of Marion Holmes, and that the defendant drove there with Evans in his car. The defendant allegedly went into the house and then came out with Holmes. Williams testified that Holmes and the defendant then told him, Williams, that the four were going to "take a ride" in the defendant's car, and that Holmes directed Williams where to drive. When the four arrived at a location in Chicago Heights, Holmes told Williams that "we don't need you for this." Then the defendant, Evans and Holmes went to the trunk of the car. Williams testified that in the rearview mirror he saw the defendant pull out a small pistol and shoot Evans in the head and that he heard a second gunshot as he saw the defendant bend over Evans.

Williams also testified that he was not aware beforehand that Evans' life was in danger, and that he believed the purpose of the drive was to find a place to dispose of stolen auto parts. Williams stated that in exchange for his testimony in the trials of the defendant and Holmes, the State agreed to recommend a six-year prison sentence for his part in an unrelated armed robbery charge and relocate Williams' family. Williams testified that the State made no promise of leniency to him with respect to his testimony in the prosecution of the Evans murder.

In separate trials, defendant and Holmes were convicted by juries of the murder of Evans. The convictions were based primarily on the testimony of Williams, the State's sole eyewitness to the murder. The jury further found no mitigating factors sufficient to preclude imposition of the death penalty, and sentenced the defendant to death.

Williams testified at the defendant's trial and at the Holmes trial. In addition, Williams gave a statement to authorities in Will County which reveals that Williams testified falsely at trial as to his role in the Evans mur-

der, and that he was inaccurately portrayed at trial as an innocent bystander to the murder, with no fear of prosecution. Additionally, at the March 9, 1982, preliminary hearing on the murder charges against both defendant and codefendant, Williams' testimony reveals that Williams expected leniency in the Evans murder in exchange for his testimony against the defendant and Holmes. His expectation was never revealed to either jury.

Williams testified to the following during the March 9, 1982, preliminary hearing when counsel for Holmes asked Williams if he had been promised or expected anything in return for his testimony against the defendant and Holmes:

"A. [Williams:] I don't know how to answer that. When you say expectation, are you talking about what I hope, or what I have been promised?

Q. [Defense counsel:] What you hope?

A. *Yes. I Do.*

Q. And you have discussed that with law enforcement agencies, at least as to what your expectations are, have you not?

A. *Yes.*

Q. Would you tell his honor what some of those expectations are?

A. I hope that I would be, my part in this particular crime would be considered for the part that it was.

Q. And that is to say *you were an innocent bystander* to an uncertain event?

A. Yes." (Emphasis added.)

Williams also testified at the preliminary hearing that the police had threatened to charge him with the murder of Evans.

Subsequent to his testifying at the preliminary hearing, Williams gave a statement to authorities in Will County in September 1992 which indicated that he was not an innocent bystander but, rather, was an accomplice in the murder of Evans. In that statement, Williams related:

"Eddie's lounge had been robbed. They found out who had set it up, his name was Elgin [Evans]. [Holmes] was known to be a hit man for Eddie and just a killer anyway. He had, he was the bouncer of the lounge at one time, he shot someone in the lounge, and, uh, it's just known in the Heights that Holmes was dangerous. So when we started asking for [Evans], people would say, 'Marion, we don't know where [Evans] is.' But [Evans has] got problems, Eddie got a hit on him 'cuz [Eddie] knew [Evans] robbed his place. *** [Holmes] took the hit from Eddie. *** So, we went in a couple places, and no one knew me from the Heights and I would ask for [Evans] and people had the plague about that; they knew what was happening. So, maybe three or four days passed by *** when Franklin pulls up in his car with someone in there. He tells us, I got [Evans] in the car.

* * *

And I, Holmes had stipulated that he was supposed to whoop his ass or break his nose or something. So we got in [the defendant's] car and I drove; we went to Chicago Heights.

* * *

Yes, it was actually supposed to have been Holmes' contract *** because Eddie paid [Holmes] x number of dollars and [Holmes] gave [the defendant] some cocaine ***."

In the appeal of the Holmes conviction, the appellate court concluded that "the evidence overwhelmingly shows (in fact the State concedes) that Williams performed acts before, during and after the commission of the murder of Evans that support his accountability" for the murder. (*Holmes*, 238 Ill. App. 3d at 489.) The State possessed evidence to support probable cause to reindict Williams for the murder of Evans on an accountability theory based on his statements, yet declined to do so. See *Holmes*, 238 Ill. App. 3d at 489.

It is also apparent from Williams' testimony at the defendant's preliminary hearing that in exchange for his testimony, Williams expected the State to forgo

charging him as an accomplice in the Evans murder. Indeed, Williams admitted that he had discussed his expectations with State authorities. However, the jury was never apprised of Williams' expectations regarding his testimony in the defendant's murder prosecution or the fact that he had discussed his expectations with State authorities. In fact, Williams was not reindicted in the Evans murder.

When the State permits false testimony to be presented to the jury, the resulting conviction cannot stand under the fourteenth amendment. (*People v. Jimerson* (1995), 166 Ill. 2d 211, 225; *Napue v. Illinois* (1959), 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 1221, 79 S. Ct. 1173, 1177.) This is true regardless of the good faith or bad faith of the government, and applies to testimony relevant to the credibility of a witness. (*Giglio v. United States* (1972), 405 U.S. 150, 154, 31 L. Ed. 2d 104, 108, 92 S. Ct. 763, 766; *People v. Martin* (1970), 46 Ill. 2d 565, 567-68.) "A new trial is required if 'the false testimony could ... in any reasonable likelihood have affected the judgement of the jury.'" *Giglio*, 405 U.S. at 154, 31 L. Ed. 2d at 108, 92 S. Ct. at 766, quoting *Napue*, 360 U.S. at 271, 3 L. Ed. 2d at 1222, 79 S. Ct. at 1178.

At trial, the State elicited testimony from Williams that he did not expect Evans to be killed on February 6, 1980. Williams testified that he was surprised by the killing. This testimony cannot be harmonized with Williams' statements describing, in detail, his awareness that Holmes, who was "just a killer anyway, *** took the hit from Eddie" and that when he went with Holmes to look for Evans and asked people where Evans could be found, "people had the plague about that; [because] they knew what was happening." Williams' statements that "I would ask for [Evans]" and "it was actually supposed to have been Holmes' contract" demonstrate that he also "knew what was happening."

36

Williams' statement to authorities in Will County belies his trial testimony that he was an innocent bystander who had no idea what was going to happen the day he drove Holmes, Franklin and Evans to the murder scene. Furthermore, the State argued to the jury that Williams had nothing more to gain by cooperating with the prosecution.[1]

The majority's assertion that "the State did not characterize Williams as an 'innocent bystander' to the commission of a crime" is unfounded. The State concedes in its brief that at trial the prosecution presented arguments and evidence to establish that Williams' role in the murder was that of an "unknowing and unwitting spectator." I fail to see the difference between an "innocent bystander" and an "unknowing and unwitting spectator." Williams' testimony and the State's portrayal of Williams in its arguments misled the jury as to Williams' role in the Evans murder and, consequently, concealed his motives for testifying against the defendant. Williams' bias and motive for testifying should have been exposed and presented to the jury. The concealment of such bias and motive denied the defendant due process.

The majority adopts the State's contention that because Williams stated that he was not explicitly *promised* leniency in the Evans prosecution but only *expected* leniency in return for his testimony, there was nothing of which to inform the jury. However, the reason that a jury in a criminal trial should be informed of any self-serving motive a witness may have for testify-

---

[1] Williams' statement to authorities in Will County in September 1982 was given *after* his preliminary hearing on March 19, 1982, at which the judge dismissed the murder charge against Williams based on a lack of probable cause. The September 1982 statement constituted new evidence which the prosecutor could have used, but did not use, in a prosecution against Williams for the Evans murder.

ing at trial is so that the jury can evaluate the testimony and weigh it in view of all the circumstances. Considering this purpose, it should not matter whether the witness was explicitly promised leniency in exchange for testifying or whether the witness expressed to the State an expectation of leniency in exchange for testifying.

At the preliminary hearing of Holmes and Franklin, Williams unequivocally stated that he expected to be treated as an innocent bystander in the Evans murder (*i.e.*, not to be charged) *in exchange for his testimony*, and that *he had discussed his expectations with State authorities*. However, at trial Williams informed the jury only that he was to receive leniency in the unrelated armed robbery charge and to be relocated with his family after his release from prison. I "do not believe the constitutional safeguard of due process of law can be made to hinge upon the gossamer distinctions indulged in by the [majority]." (*People v. McKinney* (1964), 31 Ill. 2d 246, 250.) The jury "should have been informed of *all* circumstances affecting the credibility and reliability of the witness ***." (Emphasis in original.) *McKinney*, 31 Ill. 2d at 250.

In light of the foregoing, I conclude, as the appellate court concluded in the appeal of the codefendant, Holmes, that Williams misled the jury by consciously relating to the jury only a portion of the circumstances behind his cooperation with the State's Attorney. The omission of a material fact under these circumstances implicitly denies the existence of such fact, and is equally as damaging to the truth-seeking process as if Williams had expressly denied having any expectations regarding his testimony at the defendant's trial. This court recently stated in *People v. Jimerson* that a conviction cannot stand under the fourteenth amendment when the State, " 'although not soliciting false evidence, allows it to go uncorrected when it appears.' " *Jimerson*,

166 Ill. 2d at 224, quoting *Napue*, 360 U.S. at 269, 3 L. Ed. 2d at 1221, 79 S. Ct. at 1177.

The violation of due process in the present case is similar to the recent *Jimerson* case in which the prosecution's key witness denied the "deal" of leniency promised her by the prosecution at Jimerson's murder trial. In *Jimerson*, the State argued that because there had been no "meeting of the minds" between the witness and prosecutors regarding the deal, it was not inclined to inform the jury of the agreement. (*Jimerson*, 166 Ill. 2d at 227.) This court rejected the State's contention and ruled that the defendant's due process rights had been violated because facts relevant to the credibility of the key witness were withheld from the jury. Although *Jimerson* involved an explicit promise of leniency rather than a defendant's expressed expectation of leniency as in the present case, the applicable due process principles are the same. As in *Jimerson*, the jury in the case at bar was never enlightened as to the witness' true role in the crime or self-serving motive for testifying.

The majority addresses the *procedural* issue of whether the State is collaterally estopped from challenging the appellate court's conclusions in *Holmes* (that Williams was an accomplice in the Evans murder and entertained an expectation of leniency) in this post-conviction proceeding. However, this procedural issue fails to dispose of the *substantive* issue of whether the defendant's right to due process of law has been violated. I believe this is the central issue in this case. Notwithstanding whether the trial court was bound to follow the conclusions of the *Holmes* decision in this post-conviction petition, we must determine whether Williams' statements which were not revealed at trial and Williams' expectation of leniency that was never presented to the jury establish new evidence uncovering a

due process violation at the defendant's trial. As discussed above, I cannot agree with the majority's assertion that the defendant received a fair trial. Codefendant Holmes received a new trial based on the facts revealed in this post-conviction proceeding, and I believe that the defendant should also receive a new trial in which the jury may consider the facts which establish Williams' motives for testifying against the defendant. See *People v. Jimerson* (1995), 166 Ill. 2d 211.

Apart from the *Holmes* decision and the principles of collateral estoppel, we should analyze due process rights and the defendant's right to a fair trial under the principles set forth by the United States Supreme Court and this court. (*Giglio v. United States* (1972), 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763; *Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173; *People v. Jimerson* (1995), 166 Ill. 2d 211; *People v. Martin* (1970), 46 Ill. 2d 565; *People v. McKinney* (1964), 31 Ill. 2d 246.) Accordingly, I find the majority's discussion of collateral estoppel and the mutuality requirement inapposite to the constitutional issue that is raised in this case.

Finally, I do not believe waiver should be applied to the constitutional issues raised by the defendant in the case at bar. "[T]his issue implicates principles of fundamental fairness," and we will relax a strict application of the waiver doctrine where fundamental fairness requires. (*Jimerson*, 166 Ill. 2d at 230, citing *People v. Cihlar* (1986), 111 Ill. 2d 212, 218, and *People v. Burns* (1979), 75 Ill. 2d 282, 290.) As previously stated, this is a capital case, and Williams was the sole eyewitness who testified at the two trials. The convictions of the defendant and Holmes were dependant on Williams' testimony. In the interest of fundamental fairness, the fair trial issues raised by the defendant should be addressed in the case at bar. Williams' hope for leniency and his

true role in the murder of Evans were facts that would not only have related to Williams' credibility, but may have supported the defendant's contention at trial that Williams was the person who shot Evans. (See *Alcorta v. Texas* (1957), 355 U.S. 28, 31-32, 2 L. Ed. 2d 9, 12, 78 S. Ct. 103, 105.) In cases such as this, where the conviction is largely based on the testimony of a single witness, "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." (*Napue*, 360 U.S. at 269, 3 L. Ed. 2d at 1221, 79 S. Ct. at 1177; see *Jimerson*, 166 Ill. 2d at 224.) The testimony of an accomplice witness is " 'fraught with dangers of motives such as malice towards the accused, fear, threats, promises or hopes of leniency, or benefits from the prosecution,' " and should be considered with suspicion and caution. (*People v. Williams* (1991), 147 Ill. 2d 173, 232, quoting *People v. Young* (1989), 128 Ill. 2d 1, 47-48; see also *People v. Wilson* (1977), 66 Ill. 2d 346, 349.) I am "not prepared to say that the spark of hope kindled by [Williams' expectation] of leniency was not an influencing factor on the appearance and testimony of [Williams] at *** trial." See *McKinney*, 31 Ill. 2d at 251; *Jimerson*, 166 Ill. 2d at 226.

In light of the foregoing discussion, precedent of this court (*People v. Jimerson* (1995), 166 Ill. 2d 211; *People v. Martin* (1970), 46 Ill. 2d 565; *People v. McKinney* (1964), 31 Ill. 2d 246; *People v. Lueck* (1962), 24 Ill. 2d 554; see *Holmes*, 238 Ill. App. 3d 480; *cf. People v. Harris* (1973), 55 Ill. 2d 15) and the principles established by the United States Supreme Court (*Giglio v. United States* (1972), 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763; *Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173; *Alcorta v. Texas* (1957), 355 U.S. 28, 2 L.

Ed. 2d 9, 78 S. Ct. 103), I would hold that the defendant's due process rights were violated and reverse and remand for a new trial.