2019 IL App (1st) 160451-U

Nos. 1-16-0451 & 1-16-1829 (cons.)

Order filed November 7, 2019

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the<br>) Circuit Court of<br>) Cook County. |
| Plaintiff-Appellee, | ) |
| | ) No. 02 CR 29874 |
| v. | ) |
| | ) Honorable |
| LAZEREK AUSTIN, | ) Clayton J. Crane and<br>) Honorable |
| Defendant-Appellant. | ) Alfredo Maldonado,<br>) Judges, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Justices Reyes and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court properly denied defendant leave to file his successive postconviction petitions because he failed to satisfy the requisite cause and prejudice test where the doctrine of collateral estoppel bars relitigation of his *Brady* violation claim, which is based on the State's failure to disclose its payment of relocation expenses to a witness and has already been rejected by the federal district court in defendant's *habeas corpus* petition.

¶ 2    Defendant Lazerek Austin appeals the two judgments denying him leave to file his successive petitions under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)). This court has consolidated these claims on review.

¶ 3    On appeal, defendant argues that he is entitled to leave to file a successive postconviction petition because he was required to plead only a *prima facie* claim of cause and prejudice; he sufficiently pled cause and prejudice by adequately pleading the elements of a *Brady* violation based on the State's failure to disclose its payment of relocation expenses to a key witness against him; and he sufficiently pled the materiality element of a *Brady* claim based on his allegation that the undisclosed information would have changed the defense strategy by opening up additional avenues to impeach a key witness for bias and by supporting defendant's right to choose a jury trial.

¶ 4    For the reasons that follow, we affirm the judgments of the circuit court. [1]

¶ 5                              I. BACKGROUND

¶ 6    Following his 2005 bench trial, defendant was convicted of two counts of first degree murder under a theory of accountability as a result of his involvement in the January 3, 2002 robbery of an auto repair shop and subsequent kidnapping and murder of the shop owner Jamie Flores and mechanic Rene Tapia. The police recovered the bodies of Flores and Tapia the day after their murder near a small embankment underneath a railroad trestle. Both bodies were unclothed and frozen due to the outdoor temperature. The trial evidence included the presentation of over 20 witnesses.

_____

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 7     The State's evidence showed that defendant and Marquand Williams had visited the repair shop in question on prior occasions to have their cars repaired and to purchase narcotics, which usually were retrieved from a red car during a sale. In the fall of 2001, defendant told Williams that he wanted to rob the repair shop and asked Williams to case the shop by watching it from across the street in a friend's borrowed car with tinted windows and looking in particular for the red car containing the narcotics. Williams agreed to plan the robbery but never actually cased the repair shop for defendant, who had assembled a team of fellow gang members Dewayne Harrison, codefendant Craig Lomax and codefendant Olaudah Slaughter to perpetrate the robbery.

¶ 8     At about 11 a.m. on the date of the offense, defendant drove his car to Shaun Glover's home and asked to borrow Glover's van so that defendant and "some guys" could "get high." In exchange, defendant gave Glover the keys to defendant's car. Glover observed defendant get in the van's driver's seat and Lomax get in the front passenger seat before they drove away.

¶ 9     Inesha Scott was defendant's girlfriend and the mother of two of his children. She had been to the repair shop in question with defendant a couple of times. She testified that at about noon on the date of the offense, she was with defendant in a basement apartment where he kept a safe. Slaughter and defendant's two siblings were also present. Defendant asked Slaughter "to get the ski mask and the gloves," and Slaughter gave defendant a black ski mask and gloves. Then defendant opened his safe, took out his gun and "clicked it back." He put the gun under his shirt and left the apartment.

¶ 10     At about noon at the repair shop, Tapia's nephew was leaving to pick up some auto parts when he encountered outside the shop's office two black men who asked for the mechanic. The

two men wore caps and dark coats. The nephew told Flores that two men were looking for him and then left the shop. Outside, the nephew noticed a van parked outside the shop that had not been there earlier. Later, at the bench trial, the nephew identified the van at the scene from a photograph of Glover's van.

¶ 11    The repair shop's receptionist was doing paperwork at the front desk when a tall black male approached her. He wore the type of ski mask that revealed the lower portion of his forehead and the area around and between his eyes down to the middle of his nose. He pointed a revolver at her and demanded money and the keys to Flores's office. He struck her with the gun multiple times in her face and on her head and threw her to the ground. He dragged her by her hair toward the shop's break room. Meanwhile, another black male approached and hit her, breaking her nose. She fainted. When she regained consciousness, she was on the floor in the back repair room of the shop. She was in a pool of her own blood and her hands and feet were bound with duct tape. Flores was on the floor next to her.

¶ 12    The receptionist kept her eyes closed and did not move, but she heard the offenders drag Flores into his office, which contained a safe, hit him multiple times, and then return him to the floor next to her. Then the receptionist heard the offenders beat Tapia, who told Flores in Spanish to ask the offenders why they were hitting him (Tapia). With Flores translating, the offenders demanded "the rest," and Tapia responded that the offenders already took everything. The offenders talked about killing the receptionist, Flores and Tapia. When an offender stepped on the receptionist and she did not move, they assumed that she was dead. The offenders left the back room, taking Flores and Tapia with them.

¶ 13    The testimony of a mechanic and a customer of the shop showed that the offenders beat and restrained a number of people inside the shop. Eventually, the receptionist was able to free herself and summon help. In October 2002, she viewed at the police station a lineup of five men who wore a type of face covering similar to the masks worn by the offenders. She identified codefendants Slaughter and Lomax as the offenders.

¶ 14    At the bench trial, Cornell Cardine recanted his handwritten statement to an assistant State's Attorney and his grand jury testimony, which provided incriminating testimony against defendant. Accordingly, the State impeached Cornell with his grand jury testimony and entered into evidence his handwritten statement. This evidence showed that, on the early evening of the offense, defendant and Lomax were standing on the street near an alleyway when their fellow gang members, brothers Cornell and Lydell Cardine, observed them. Lydell was driving the "gang car" around the area and Cornell was his passenger. Lydell stepped out of the car, spoke to defendant and Lomax, returned to the car, and told Cornell that they were supposed to follow defendant and Lomax. Defendant and Lomax walked into the alley and out of sight. A few minutes later, Lomax drove Glover's van out of the alley and motioned to Lydell, who followed him. About five minutes later, the van stopped and Slaughter and Harrison exited the van and entered Lydell's car.

¶ 15    The vehicles continued driving a few more blocks until Lomax stopped the van near some railroad tracks. Lydell complied with Slaughter's instructions to drive the car past the van and park some distance in front of it. Then Slaughter exited the car and walked toward the van while Lydell, Cornell and Harrison remained in the car. Cornell heard a total of either three or four gunshots that came from the direction of the van. Then Slaughter returned to the car and got

inside. Lydell followed Slaughter's instructions and drove the car to a carwash. When the van driven by Lomax arrived at the carwash, Lomax exited the van, spoke to the carwash attendants, and entered the car. Lydell drove away from the carwash with Cornell, Harrison, Slaughter and Lomax as his passengers. Lydell followed Lomax's instructions to drive to the area where they "hung out at." Thereafter, Lydell and Cornell exited the car, and Lomax drove away in the car with Harrison and Slaughter.

¶ 16    According to Inesha Scott, on the evening of the date of the offense, she joined defendant in a taxi and went to his apartment, where they were met by Lomax, Slaughter, and Lydell. They all went into the apartment bedroom and Scott observed "a little" money on top of the bedroom television. Defendant said, "I told you all don't shoot them guys," and also asked "where the van went." Afterwards, Scott and defendant went to the home of Scott's aunt and spent the night there. When they were watching the news on television, defendant said, "Man, man, man, man." Scott was interviewed by the police regarding this case in November 2002.

¶ 17    At about 11:30 p.m. on the date of the offense, Lomax and Cornell arrived at Glover's home and told him that his van was at the carwash. When Glover went to the carwash to retrieve his van, he discovered blood all over the dashboard and the floor between the front and second rows of seats. When Glover spoke to defendant a few days later, defendant said that "somebody got shot in the leg" and it was "one of his buddies."

¶ 18    At the scene where the victim's bodies were found, the police recovered two .380 Winchester cartridge cases, some gray duct tape, and a cigarette butt with bloodstains. Forensics testing established that DNA from the cigarette butt matched that of Tapia and Slaughter. Furthermore, DNA from the blood spattered carpeting of the van matched that of Tapia. The

autopsies established that Tapia died as a result of multiple stab and gunshot wounds and Flores died as a result of multiple gunshot wounds. Both victims had been shot in the head. Tapia was stabbed through the heart, and Flores was shot through the leg.

¶ 19    Williams testified that he had three felony convictions involving possession of a controlled substance and aggravated unlawful use of a weapon. He had been childhood friends with defendant and codefendants Lomax and Slaughter. When Williams and defendant spoke a few days after the offense, defendant said that they went in the repair shop, did the kidnappings and murders, and defendant shot one of the victims and "blew [his] knee off."

¶ 20    Williams had daily contact with defendant from the date of the offense until Williams' arrest in August 2002, when a police car "ran over" him, and he sustained two broken hips and two broken legs and thought that he was going to die. In October 2002, Williams was in custody in jail for violating the electronic home monitoring condition of his release on an unrelated felony narcotics case. When Williams asked defendant to "bond [him] out," defendant refused. Then Williams spoke with detectives about the repair shop murders, asserting at trial that he was motivated by his desire to "come clean," "change his ways," and save his girlfriend and their children. Williams told a detective that he did not feel safe in jail because he was a gang member, and the detective responded that efforts would be made to try to get Williams released on bond and placed back on electronic home monitoring. Williams ultimately was sentenced to probation on that felony narcotics case. Williams testified that he felt betrayed by defendant because Williams had bonded defendant's brother out of jail in 1998, but Williams "caught a violation" when he did not take the blame for this brother's possession of a gun in 1999, so defendant and his brother "jumped" Williams. Williams acknowledged that he received a check

from the State for witness relocation expenses related to this case; however, Williams returned that check to the State.

¶ 21    The defense called as witnesses a detective and an assistant State's Attorney. The defense questioned them about the State's efforts to get Williams released from jail on bond and placed on electronic home monitoring. The defense also questioned these witnesses to discredit Williams regarding his motivation to discuss the offense in question with the State.

¶ 22    The trial court found defendant guilty of the first degree murder of Flores and Tapia. Although the court noted some problems with the credibility of Williams and his ex-girlfriend (Naketa Douglas, who testified that Lomax came to her home before the offense and borrowed a knife that he never returned), the trial court found the testimony of Cornell, Glover and Scott credible and reliable. Although none of these witnesses testified that defendant was present either at the repair shop or near the railroad tracks where the two bodies were found, sufficient evidence linked defendant to the crime because he was directly connected to the gun, a mask and Glover's van and "it was obvious and clear *** beyond a reasonable doubt that [defendant] started the ball rolling."

¶ 23    Defendant's posttrial motions argued, *inter alia*, that trial counsel was ineffective for failing to either question Scott about her drug and alcohol abuse and intoxication at the bench trial or confront her with letters exposing her animosity toward defendant based on his affair with another woman. Both defendant and his trial counsel testified at the hearing on the posttrial motions. Trial counsel believed that Scott's letters were not useful to impeach her because the "overall gist" of the letters showed that she was very fond of defendant. Moreover, Scott's behavior at the bench trial did not indicate that she was either high or drunk.

¶ 24    The court denied defendant's posttrial motion, finding that defendant was not denied effective assistance of trial counsel and the evidence of his involvement in the crime was overwhelming. Regarding Scott, the court noted that her demeanor during her testimony indicated that she was reluctant to testify against defendant. Defendant was sentenced to natural life imprisonment.

¶ 25    On direct appeal, defendant challenged the sufficiency of the evidence to sustain his conviction and argued that trial counsel rendered ineffective assistance by failing to impeach Glover and Scott. This court affirmed his conviction on appeal. *People v. Austin*, No. 1-06-0198 (Sept. 4, 2009).

¶ 26    In August 2010, defendant filed a postconviction petition pursuant to the Act, and the circuit court dismissed that petition as frivolous and patently without merit in October 2010. Also in October 2010, defendant filed in federal district court a petition for a writ of *habeas corpus*, which was stayed pending resolution of his appeal of the dismissal of his 2010 postconviction petition.

¶ 27    In September 2012, this court affirmed the summary dismissal of defendant's 2010 postconviction petition.

¶ 28    In November 2012, defendant filed his first successive postconviction petition based on newly discovered evidence that the State had provided Scott with relocation expenses in consideration for her testimony at trial. Defendant argued that the State's failure to turn over this information violated *Brady v. Maryland*, 373 U.S. 83 (1963), and, in light of this evidence, he did not waive his right to a jury trial knowingly and voluntarily.

¶ 29    In September 2013, the federal court lifted the stay of defendant's *habeas* petition. In October 2013, defendant filed a supplemental *habeas* petition, which included a *Brady* claim

based on the State's failure to disclose that it had provided Scott with relocation expenses. Specifically, defendant argued that he would not have waived his right to a jury trial if he had known about the expenses the Cook County State's Attorney's Office incurred to relocate Scott prior to the trial. Defendant supported his *Brady* claim with documents that showed Scott requested relocation because she feared retaliation from defendant or his family since his family contacted her to change her testimony against defendant. Scott requested first month's rent, a security deposit and moving expenses.

¶ 30 In June 2014, the federal district court denied defendant's *habeas* petition and declined to certify any issues for appeal. Regarding the *Brady* claim, the district court found that defendant failed to satisfy two of the three requisite elements of such a claim. Specifically, defendant failed to establish that the relocation payment evidence was (1) favorable to him as either exculpatory or impeaching, because it would have revealed Scott's fear of retaliation from defendant or his family; and (2) material, *i.e.*, created a reasonable probability that its disclosure to the defense would have changed the result of the trial, because the State presented overwhelming evidence of defendant's guilt and this impeachment evidence was insignificant. *Austin v. Harrington*, No. 10C6474, 2014 WL 2725985, at *10 (N. D. Ill. June 16, 2014).

¶ 31 On October 9, 2015, the circuit court dismissed defendant's first successive postconviction petition based on *res judicata*, stating that the federal district court had already adjudicated this exact claim in defendant's supplemental *habeas* petition. Defendant's appeal of this summary dismissal of his first successive petition has been assigned case No. 1-16-0451.

¶ 32 Meanwhile, in February 2016, defendant filed a "motion for discovery," which the circuit court treated as his second successive postconviction petition. Defendant argued four variations of the allegation that the State committed a discovery violation when it failed to disclose that it

had provided Scott with relocation expenses, plus a claim that the State knowingly allowed Scott, in return for relocation expenses, to testify falsely before the grand jury.

¶ 33    On May 20, 2016, the circuit court dismissed this second successive postconviction petition, ruling that the discovery violation claims were *res judicata*. Also, the court ruled that the perjury claim did not merit relief because it was conclusory and entirely unsupported by any evidence, and failed the cause and prejudice test for successive petitions because it was based on testimony in the record and could have been challenged on direct appeal. Defendant's appeal of this summary dismissal of his second successive petition has been assigned case No. 1-16-1829.

¶ 34    Thereafter, this court consolidated case Nos. 1-16-0451 and 1-16-1829 on appeal.

¶ 35                                    II. ANALYSIS

¶ 36    On appeal, defendant argues that he is entitled to leave to file a successive postconviction petition because he sufficiently pled a *Brady* violation claim based on the State's failure to disclose its relocation payments to Scott and her statements that she feared retaliation from defendant or his family after his family contacted her about her testimony incriminating defendant.

¶ 37    Under *Brady*, a criminal defendant's right to due process and a fair trial is violated by the prosecution's failure to disclose material evidence that is favorable to the defense, and such claims are cognizable in postconviction proceedings. *People v. Harris*, 206 Ill. 2d 1, 44 (2002). Evidence is material if there is a reasonable probability that disclosure of the evidence would have altered the outcome of the proceeding. *People v. Sanchez*, 169 Ill. 2d 472, 486 (1996). "A reasonable probability of a different result is one *** sufficient to undermine confidence in the trial's actual outcome." (Internal quotation marks omitted.) *People v. Anderson*, 375 Ill. App. 3d

990, 1011 (2007). To successfully establish a *Brady* claim, a defendant must show that (1) the undisclosed evidence is favorable to him because it is either exculpatory or impeaching; (2) the evidence was either willfully or inadvertently withheld by the State; and (3) withholding the evidence resulted in prejudice to him. *Id.*

¶ 38     Defendant argues that he was required to plead only a *prima facie* claim of cause and prejudice, which he did by adequately pleading the elements of a *Brady* violation. He contends that he pled a *prima facie* case of materiality because the undisclosed information would have impeached Scott for bias and changed the defense strategy by opening up additional avenues to impeach her. Defendant asserts that Scott was the State's key witness and the non-disclosure undermined defendant's right to choose a jury trial. Specifically, defendant argues that only Scott's testimony linked him to the gun and mask in a case where none of the State's other evidence placed him either at the garage when the robbery and kidnapping occurred, or inside the van when the victims were stabbed or shot, or at the scene by the railroad tracks where the victims were shot and their bodies discarded, or at the carwash where the offenders attempted to remove from the van the evidence of their crime. Defendant argues that the disclosure of the relocation information might have led him to select a jury trial instead of a bench trial because he believes jurors would have been more likely than a judge to discredit Scott's testimony based on her receipt of financial assistance.

¶ 39     The State responds that the doctrine of collateral estoppel precludes defendant from raising his *Brady* claim in a successive postconviction petition because the federal district court ruled on this exact issue in defendant's *habeas* petition; defendant has not attached new evidence to his successive postconviction petitions to defeat the application of the preclusion doctrine; and

even if this court relaxed the application of the preclusion doctrine, defendant does not meet the prejudice prong and thus is not entitled to leave to file a successive postconviction petition.

¶ 40    The record includes Scott's witness relocation documents from the Cook County State's Attorney's Office, dated December 2, 2002. These documents show that Scott was a witness in the cases against defendant and codefendants Lomax and Slaughter. Scott and her two-year-old child were living in the two-bedroom apartment of Scott's mother, and the monthly rent was $650. Scott had already contributed to the case by providing a handwritten statement and grand jury testimony regarding defendant's participation in the murders of Flores and Tapia. According to the relocation documents, defendant's family contacted Scott to change her testimony. Scott was requesting relocation because defendant's family contacted her regarding her cooperation with the police and defendant also attempted to contact her. She feared that defendant or his family would take action against her. Scott was requesting first month's rent, a security deposit and moving expenses.

¶ 41    The record also includes affidavits, signed in 2015, from defendant and his brother, Laavion Goings. Goings attested that he was incarcerated from 2000 to 2004 and never contacted or threatened Scott due to her involvement in defendant's case, never attempted to convince her to change her statements to the police or grand jury, and did not learn about her participation in the case until 2004. Defendant attested that he did not threaten Scott and was unaware that she was a State's witness until after her relocation.

¶ 42    The Act provides a statutory remedy to criminal defendants who claim that substantial violations of their constitutional rights occurred at trial. *People v. Eddmonds*, 143 Ill. 2d 501, 510 (1991). The Act contemplates the filing of only one postconviction petition (*People v. Flores*, 153 Ill. 2d 264, 273 (1992)), providing that any claim not raised in the original or amended

petition is subject to the doctrines of *res judicata* and waiver (725 ILCS 5/122-3 (West 2012); *People v. Smith*, 341 Ill. App. 3d 530, 535 (2003)). However, the filing of a successive postconviction petition may be allowed where the proceedings on the initial petition were fundamentally deficient. *Flores,* 153 Ill. 2d at 273-74. Specifically, the waiver provision can be lifted and a successive petition can be considered on the merits if it either meets the cause and prejudice test of section 122-1(f) of Act (725 ILCS 5/122-1(f) (West 2012)), or its consideration is necessary to prevent a fundamental miscarriage of justice because the defendant shows a claim of actual innocence (*People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002)).

¶ 43    A defendant seeking to file a successive postconviction petition must first obtain leave of court. *People v. Tidwell*, 236 Ill. 2d 150, 157 (2010). Here, defendant seeks leave to file his successive postconviction petition under the cause and prejudice test of section 122-1(f) of the Act, which provides:

> "Only one petition may be filed by a petitioner under this Article without leave of the court. Leave of the court may be granted only if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure. For purposes of this subsection (f): (1) a prisoner shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings; and (2) a prisoner shows prejudice by demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122–1(f) (West 2012).

We review *de novo* the denial of a defendant's motion for leave to file a successive postconviction petition (*People v. Wrice*, 2012 IL 111860, ¶ 50), and may affirm the denial on any ground of record (*People v. Johnson*, 208 Ill. 2d 118, 129 (2003)).

¶ 44     A defendant's motion for leave to file a successive postconviction petition satisfies the section 122-1(f) cause and prejudice requirement if the motion adequately alleges facts demonstrating cause and prejudice. *People v. Smith*, 2014 IL 115946, ¶ 34. Moreover, the cause and prejudice test for successive petitions involves a higher standard than the frivolous or patently without merit standard applied to first-stage postconviction petitions. *Id.* ¶ 35. A defendant seeking leave to file a successive petition must submit enough in the way of pleadings and documentation to allow a circuit court to make an independent determination on the legal question of whether adequate facts have been alleged for a *prima facie* showing of cause and prejudice. *Id.*

¶ 45     If a defendant fails to adequately allege cause and prejudice, the circuit court does not reach the merits of his successive petition because the cause and prejudice test is a procedural prerequisite to obtaining that review. *People v. Welch*, 392 Ill. App. 3d 948, 955 (2009). "If the court determines that cause and prejudice have been adequately alleged and allows the petition to be filed, it advances to the three-stage process for evaluating postconviction petitions. During this process, the State would have an opportunity to seek dismissal of the petition on any grounds, including the defendant's failure to prove cause and prejudice for not having raised the claims in the initial postconviction petition." *People v. Bailey*, 2017 IL 211450, ¶ 26.

¶ 46     Our supreme court has held that "leave of court to file a successive postconviction petition should be denied when it is clear, from a review of the successive petition and the

documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *Smith*, 2014 IL 115946, ¶ 35.

¶ 47    The preclusion doctrine of collateral estoppel prevents a defendant from "taking two bites out of the same appellate apple" (*People v. Partee,* 125 Ill. 2d 24, 37 (1988)), by barring relitigation of an issue already decided in a prior case (*People v. Enis,* 163 Ill. 2d 367, 386 (1994)). That is, "[t]he doctrine applies 'when a party *** participates in two separate and consecutive cases arising on *different* causes of action and some controlling fact or question material to the determination of both causes has been adjudicated against that party in the former suit by a court of competent jurisdiction.' " (Emphasis in original.) *People v. Moore,* 138 Ill. 2d 162, 166 (1990), quoting *Housing Authority v. Young Men's Christian Ass'n of Ottawa,* 101 Ill. 2d 246, 252 (1984). The collateral estoppel doctrine has three requirements: (1) the court rendered a final judgment in the prior case; (2) the party against whom estoppel is asserted was a party or in privity with a party in the prior case; and (3) the issue decided in the prior case is identical with the one presented in the instant case. *People v. Franklin,* 167 Ill. 2d 1, 12 (1995).

¶ 48    Here, the three requirements of the collateral estoppel doctrine are met. The federal district court rendered a final judgment on defendant's *habeas corpus* petition in 2014. Moreover, the *Brady* claim decided in that case, based on the State's failure to disclose that it provided Scott with relocation expenses, is identical to the one presented here. Specifically, defendant's claim before the federal court argued that, based on the undisclosed facts regarding Scott's relocation expenses, the State paid her to cooperate in defendant's prosecution, this suppressed information would have impeached Scott, and defendant would have asked for a jury

trial if he had known about this evidence. *Austin*, 2014 WL 2725985, at \*9-10. The federal court analyzed the merits of defendant's *Brady* claim under the standard set forth in section 2243 of the United States Code (28 U.S.C. § 2243 (West 2014)), which required the court to "dispose of the matter as law and justice require." *Id*. at \*9. The court concluded that defendant's claim lacked merit because he failed to show the *Brady* claim elements that the evidence was favorable to him and material. *Id*. at \*10-11. Specifically, the court found that the undisclosed evidence was insignificant because any attempt to use it to impeach Scott would have resulted in the disclosure that she requested relocation because she feared retaliation by defendant and his family. *Id*. at \*10. Moreover, there was not a reasonable probability that the disclosure of this insignificant impeachment evidence would have changed the result of the trial based on the State's overwhelming evidence of defendant's guilt. *Id*.

¶ 49    However, even when the three elements of collateral estoppel are satisfied, this equitable doctrine should "not be applied to preclude parties from presenting their claims or defenses unless it is clear than no unfairness results to the party being estopped." *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 391 (2001). Courts "must balance the need to limit litigation against the right of a fair adversary proceeding in which a party may fully present his case." *Id*. To "determine whether a party has had a full and fair opportunity to litigate an issue in a prior action," the court must examine "those elements which comprise the practical realities of litigation." (Internal quotation marks omitted.) *Id*.

¶ 50    Our review of the record establishes that defendant had a full and fair opportunity to litigate this *Brady* claim in his prior federal case. The federal district court's review of defendant's *habeas* petition included a lengthy summary of the evidence presented at defendant's bench trial, and defendant supported his *Brady* claim before the federal court with the same

State's Attorney's office relocation request documents that he uses here to support his successive postconviction petition *Brady* claim.

¶ 51 Furthermore, the additional evidence defendant submitted with his successive postconviction petitions, *i.e.*, the 2015 affidavits of defendant and his brother, does not constitute substantial new evidence to warrant this court to relax the application of collateral estoppel in the interests of fundamental fairness. See *People v. Patterson*, 192 Ill. 2d 83, 139 (2000). In their 2015 affidavits, defendant and his brother challenge Scott's statements regarding threats and retaliation from defendant's family. In the context of this appeal, these affidavits would be newly discovered and sufficient to warrant a new trial if they were (1) material and not merely cumulative, (2) of such conclusive character that they would probably change the result on retrial, and (3) could not have been discovered or discoverable through the defense's due diligence in the prior federal district court proceeding. See *id*.

¶ 52 Defendant's petition at issue here alleges that the defense discovered the undisclosed relocation information in 2011 but defendant offers no explanation for why he did not include similar affidavits from his brother, himself or other family members when defendant filed his *Brady* claim in his supplemental *habeas* petition in the federal district court in October 2013. Furthermore, the 2015 affidavits of defendant and his brother are not so conclusive as to probably change the result on retrial because Scott's statements about threats and retaliation did not identify either defendant or his brother as the culprit.

¶ 53 The federal district court decided this *Brady* claim against defendant and we decline to consider it again where he had a full and fair opportunity to litigate this claim in his federal court *habeas corpus* proceeding and he has not presented newly discovered evidence to warrant the

relaxation of the application of collateral estoppel. We conclude that the circuit court correctly denied defendant leave to file his successive postconviction petitions.

¶ 54                          III. CONCLUSION

¶ 55    For the foregoing reasons, we affirm the judgments of the circuit court denying defendant leave to file a successive postconviction petition.

¶ 56    Affirmed.